EXHIBIT C (CORRECTED)

```
 1   STATE OF ILLINOIS    )
 2                        )  SS.
 3   COUNTY OF COOK       )
 4              IN THE UNITED STATES DISTRICT COURT
 5             FOR THE NORTHERN DISTRICT OF ILLINOIS
 6                      EASTERN DIVISION
 7
 8   ARMANDO ARIAS,               )
 9         Plaintiff,            )
10      vs.                      )  No. 1:17-ev-08897
11   CITGO PETROLEUM CORPORATION, )
12   et al.,                     )
13         Defendant.            )
14
15           The deposition of JAMES TANCREDI, called for
16   examination, taken pursuant to the provisions of the
17   Code of Civil Procedure and the Rules of the Supreme
18   Court of the State of Illinois pertaining to the taking
19   of depositions for the purpose of discovery, taken
20   before Howard N. Reisman, CSR No. 084-000411, a
21   Certified Shorthand Reporter of said state, at 8401
22   Crawford Avenue, Suite 104, Skokie, Illinois, 60076, on
23   July 26, 2018, at 10:30 a.m.
24
```

1    APPEARANCES:

2

3    FRADIN LAW OFFICES

4    BY:  MR. MICHAEL L. FRADIN

5    8401 Crawford Avenue, Suite 104

6    Skokie, Illinois 60076

7    (847) 986-5889

8    mike@fradinlaw.com

9        Appeared on behalf of the Plaintiff;

10

11   JONES DAY

12   BY:  MR. MICHAEL J. GRAY

13   77 West Wacker Drive, Suite 3500

14   Chicago, Illinois 60601-1692

15   (312) 782-3939

16   mjgray@jonesday.com

17       Appeared on behalf of the Defendants;

18

19   CITGO PETROLEUM CORPORATION

20   BY:  MS. ERIKA COURTADE

21   1293 Eldridge Parkway

22   Houston, Texas 77077

23       Appeared on behalf of Citgo Petroleum Corporation.

24

```
 1                    I N D E X
 2    EXAMINATION BY:                        PAGE
 3    Mr. Fradin                               4
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1              (Whereupon the Witness was duly sworn.)
 2                        JAMES TANCREDI,
 3    called as a Witness herein, having been first duly sworn
 4    on oath, was examined upon oral interrogatories and
 5    testified as follows:
 6                        EXAMINATION
 7                            BY
 8                        MR. FRADIN
 9         Q    Good morning.
10         A    Good morning.
11         Q    Can you state your name for the record.
12         A    James Tancredi, T-a-n-c-r-e-d-i.
13              COURT REPORTER:  It's an opera by Rossini.
14              THE WITNESS:  Yep.  Who also wrote the William
15    Tell Overture.
16    BY MR. FRADIN:
17         Q    Have you ever sat for a deposition before,
18    James?
19         A    Yes.
20         Q    When?
21         A    Several times.  Most recent may have been two
22    years ago.
23         Q    In what capacity have you sat for depositions?
24         A    I gave testimony at National Labor Board
```

1  hearing for a dispute with a local labor union.  Also

2  testified at an OSHA citation case that we were

3  contesting, and then a couple of injury cases for

4  contractor injuries in the facility over the years.

5      Q    Okay, have you ever sat for a deposition

6  outside your capacity as an employee of Citgo?

7      A    No.

8      Q    Okay.  The OSHA citation case that you

9  mentioned, tell me a little bit about that?

10     A    That was a case that OSHA gave us a citation

11  regarding one of our procedures, our lockout/tagout

12  procedure that we disagreed with the citation so we

13  disputed it.  So, it went all the way through the

14  hearing process.

15     Q    Was there a court reporter at the hearing?

16     A    Yes.

17     Q    Where was the hearing?

18     A    Chicago.

19     Q    Where in Chicago?

20     A    I don't remember what building.  It was

21  downtown.

22     Q    Was it at a OSHA building, do you know?

23     A    No, I don't think it was an OSHA building, it

24  was -- it was one of the buildings near the Dirksen

1  Federal Building but it wasn't the Dirksen Federal

2  Building.  I don't know where it was.

3       Q    And you sat for a deposition in that case as

4  well?

5       A    Yeah.

6       Q    Where was the deposition held?

7       A    The deposition may have been in the OSHA

8  offices.

9       Q    Do you remember who took the deposition?

10      A    I don't remember her last name.  Elizabeth

11 something.  I just don't remember.

12      Q    Do you remember -- did you have an attorney

13 there for the deposition?

14      A    Yes, Nina Stillman was the outside attorney.

15 I do not think that I had any Citgo employed attorney

16 there.

17      Q    Okay.  What was the nature of your testimony?

18      A    I was one of the individuals that, I was in

19 the same capacity that I am now as Manager of Health,

20 Safety, Security, and Environmental and I was also very

21 familiar with the incident investigation that OSHA came

22 in to investigate and give the citation on so --

23      Q    Okay.  Well, tell me about the citation a

24 little bit then, please?

1        A    OSHA had a citation that indicated that our

2   lockout/tagout program was missing one specific

3   component per their standard.  We disagreed that it was

4   missing that so --

5        Q    What was the outcome of the hearing?

6        A    There citation was upheld.

7        Q    What year was this?

8        A    The citation was probably 2013, so I think

9   that hearing probably occurred in 2014, just by

10  logistics but --

11       Q    Tell me what lockout/tagout program is?

12       A    It's the program used to isolate equipment

13  that was in service when you're taking it out of service

14  to perform maintenance or some type of activity that

15  requires it to be off-line and hydrocarbon free.

16       Q    Do you remember what piece of equipment the

17  citation was related to?

18       A    They didn't make the citation specific to a

19  piece of equipment.  They rather made the citation

20  specific to you have a procedure that says how you do

21  this, how you perform this work, so we think your

22  procedure is not sufficient versus saying for one piece

23  of equipment.

24            COURT REPORTER:  You say sufficient versus

1  what?

2          THE WITNESS:  Versus pointing to one specific

3  piece of equipment.

4  BY MR. FRADIN:

5      Q    Do you have any documentation in connection

6  with this citation?

7      A    We probably have the citation but I don't have

8  it with me.  I'm sure somebody has it.

9      Q    Who would have it.

10     A    We'd have it in legal, be probably, Casey

11  Bullock probably has it.  Ernie Boutte probably has it.

12     Q    When you say the citation was upheld, what

13  does that mean?

14     A    That means that the -- I'm not sure who the

15  OSHA Judge is, ended up in the end agreeing that, with

16  the citation, that we needed to do something different

17  to enhance our lockout/tagout program per the OSHA

18  citation.

19     Q    Do you remember what the resolution was to

20  that?

21     A    Yes.  It was simply providing a place on our

22  existing documentation for the operating personnel that

23  perform the verification that the equipment was isolated

24  to perform a written signature document validation that

1  they verified that the isolation was successful and the

2  energy was isolated.

3      Q    All right.  Are you -- tell me first off, you

4  mentioned it before, but if you can tell me again, what

5  is your position there, how long have you held it?

6      A    I'm the Manager of Health, Safety, Security,

7  and Environmental Protection and I've had that since

8  2012.

9      Q    And describe that position for me?

10     A    It's the division manager responsible for the

11 functions that perform safety support in the field,

12 emergency response, fire department, the security

13 function of the refinery, the security guards of the

14 facility, the environmental technical media experts that

15 support compliance with the emissions permits.  I'm

16 trying to think if I missed anything.  PSM program.

17 Okay, that's probably the primary.

18     Q    What was your position prior to being Manager

19 of Health, Safety, and Security?

20     A    I'm the General Manager of Operations and

21 Maintenance.

22     Q    And what years were you General Manager of

23 Maintenance and Operations?

24     A    From 2008 to 2012.

1    Q    And in your position as Manager of Health,

2 Safety, and Security, is Casey Bullock directly -- does

3 he directly report to you?

4    A    Yes.

5    Q    And since when did Casey Bullock directly

6 report to you?

7    A    Since the day I moved into that position in

8 2008.

9    Q    Okay.  And he still does that?

10    A    And he still does.

11    Q    Okay.  And does -- did the Plaintiff, Dino

12 Arias, report to Casey Bullock?

13    A    Yes.

14    Q    Did the Plaintiff, Dino Arias, report to you

15 as well?

16    A    He reports to Casey who reports to me.  So he

17 was not a direct report.

18    Q    Okay.  Do you know what this lawsuit is about?

19    A    In general.

20    Q    Can you tell me what it's about?

21    A    My understanding is that Dino's claiming he's

22 inappropriate loss of employment so I don't know what

23 all the terms are.

24    Q    Okay.  Have you reviewed any documents related

1    to this litigation?

2         A    Yes.

3         Q    What did you review?

4         A    I reviewed, you know, I got this deposition

5    letter that I needed to report to deposition.  I looked

6    over some things from a request from the Chemical Safety

7    Board a few years ago that were referenced.  Didn't look

8    a lot.  I looked through my e-mail to see if I had any

9    documentation related to past communication.  Looked at

10   a incident investigation that was one of the things that

11   we supplied the Chemical Safety Board on a request from

12   a few years ago because I was aware that there was a

13   request for that information.  Not at lot -- not a lot

14   of information, though.

15        Q    Did you look over the complaint at all?

16        A    I looked at the complaint.

17        Q    Okay.  Is there -- do you have any -- are any

18   parts of the complaint that you disagree with?

19        A    I'd have to look at the complaint to see.  I

20   can't recall.

21        Q    So when did you review the complaint?

22        A    It had to be months ago, months to weeks ago.

23        Q    Okay.  And nothing stuck out as something you

24   remember disagreeing with?

1     A    I don't remember the content of the complaint

2 so whether I agree or disagree, I don't know, it just --

3     Q    Okay.

4     A    It wasn't -- I just don't recall the detail of

5 the complaint.

6     Q    Okay.  Did you review any discovery responses?

7     A    The items I mentioned on the Chemical Safety

8 Board, that was a request that came to me to say do who

9 have some information on that so that's why I ended up

10 reviewing that.

11     Q    What did you search in your e-mail for?

12     A    I did that.  I did a specific search for

13 Chemical Safety Board.

14     Q    Why did you search Chemical Safety Board.

15     A    Because somebody --

16     MR. GRAY:  Well, I'm going to object.  So,

17 just -- you can answer any of these questions as long as

18 it doesn't implicate any communications that you and any

19 lawyers for Citgo, either inside or outside.  So if you

20 can answer Mr. Fradin's question, that's fine but if it

21 requires attorney/client communications, I'll direct you

22 not to answer but I'm not sure if you can answer that

23 one without divulging.

24     THE WITNESS:  Okay.  That one just -- it was

1  specifically quested will you ever get us such a request

2  from the Chemical Safety Board that would have happened

3  a couple years ago so that's what I look for.

4       COURT REPORTER:  That's when I would what?

5       MR. GRAY:  He said that's what I look --

6       THE WITNESS:  That's what I looked for.

7  BY MR. FRADIN:

8       Q    Do you know why the Chemical Safety Board is

9  relevant to this particular lawsuit?

10      MR. GRAY:  Objection, form.

11      THE WITNESS:  There was a request made, I know

12  that so --

13  BY MR. FRADIN:

14      Q    Okay.  Have you had any communications with

15  the Chemical Safety Board?

16      A    Nothing direct.

17      Q    If you were to communicate with the Chemical

18  Safety Board indirectly, how does that look?

19      MR. GRAY:  Objection to form.

20      THE WITNESS:  Yeah, I guess --

21      MR. FRADIN:  Well, let me rephrase that.

22  BY MR. FRADIN:

23      Q    What do you mean by not directly?

24      A    For example, the request came directly to our

1   process safety management coordinator and then he and I

2   provided the data for the request but then the data went

3   to our attorney to respond to the Chemical Safety Board

4   request so --

5        Q    And start at the beginning.  Who was the first

6   person in this chain of --

7        A    Our Process Safety Management Coordinator.

8        Q    And who is that?

9        A    Ray Boutte.

10       Q    Okay.

11            COURT REPORTER:  How do you spell Boutte?

12            THE WITNESS:  B-o-u-t-t-e.

13   BY MR. FRADIN:

14       Q    So you are aware of requests from the Chemical

15   Safety Board to Ray Boutte?

16       A    Yes.

17       Q    What is the nature of those requests?

18       A    They were requesting information throughout

19   industry on their target, as I recall, was several

20   hundred incidents of various types that had happened and

21   they were asking locations to provide them with

22   information related to that incident investigation

23   reports so that they could look at them.

24       Q    What were the incidents that they wanted to

1   look at at Citgo?

2       A     Ours, they wanted to look at two.  One I

3   remember specifically was a follow-up from a vacuum unit

4   fire from October of 2013.  The other one ended up not

5   being an incident.  It was flaring event but they had

6   seen somewhere that there was S02 emissions related to

7   it so they had asked for info on it and what we gave

8   back to them was explaining that that wasn't really an

9   incident, it was a flaring event.

10      Q     When would the SO2 emission flaring event had

11  been?

12      A     I don't know.  I would have to look at the

13  request to see.

14      Q     Do you know about?

15      A     No, no.

16      Q     All right.  Tell me about the fire in October

17  2013?

18      A     Do you have any more specific question than

19  that?

20      Q     Yeah, tell me what happened in October 2013,

21  you said there was a vacuum unit fire?

22      A     There was a issue -- a leaking valve when they

23  were isolating a pump for maintenance and their valve

24  leaked, vacuum tower bottoms product and eventually

1  found an ignition source and started a fire in the area

2  of the vacuum tower.

3      Q    What was the outcome from the fire?

4      A    Damage to the equipment, piping in the pump

5  system underneath the vacuum tower and in the general

6  geographic area.

7      Q    Okay.

8      A    No injuries.

9      Q    Are you familiar with a fire that occurred at

10 the plant in 1984?

11     A    I know that there was a fire -- there was a

12 fire in 1984.  I believe it was a Unical facility at

13 that time.

14     Q    What do you know about the fire that occurred

15 in 1984?

16     A    It was a large fire on their unset gas plant.

17     Q    Do you know about fatalities in the fire?

18     A    There were a lot of fatalities.

19     Q    How many?

20     A    Seventeen, I think.

21     Q    Are you aware that Dino was working at the

22 plant at the time?

23     A    No.

24     Q    You didn't know that?

1      A      No.  He may have been.  I didn't know Dino

2  back then.

3      Q      When did you meet Dino?

4      A      Probably 90's.  I don't know exactly when but

5  I was in engineering and maintenance for my first

6  several years so --

7      Q      Well, we talked about the Chemical Safety

8  Board earlier a little bit, correct?

9      A      Correct, we mentioned them.

10      Q      Yeah, are you aware of communications between

11  Dino and the Chemical Safety Board?

12      A      I saw one e-mail at one time where Dino had,

13  was conversing or exchanging with a request from the

14  Chemical Safety Board.

15      Q      When did you review that e-mail?

16      A      I don't know the timing of that.  I recall

17  Casey Bullock first mentioned it to me and so I asked

18  him do you have any detail?  Couldn't tell if it was a

19  formal or informal request but it was for something that

20  had happened at Unical.  So I asked him if he could give

21  me anymore info and he provided, forwarded an e-mail

22  that, exchange between Dino and somebody at the Chemical

23  Safety Board.

24      Q      What did Casey tell you?

1    A    He told me that Dino -- Dino had gotten a

2  request or I can't remember exactly what it was but

3  somehow from the Chemical Safety Board they were

4  requesting information about the Unical 1984 gas plant

5  fire.

6    Q    And what was the nature of your conversation

7  with Casey, was it e-mail or was it --

8    A    He came and saw me and then I asked him he had

9  any, you know, additional information and he forwarded

10 an e-mail after that.

11   Q    Okay.  Where did he come to see you?

12   A    In my office.

13   Q    Okay.  And what was -- what else was said

14 during that conversation?

15   A    You know, pretty much, first it's find out

16 what kind of request is this?  Did he just talking to

17 somebody or is it a formal request and then since it was

18 a request for another company, basically for Unical, I

19 said once we get the request we'll send it to legal,

20 which is what we did.

21   Q    When you say is he just talking to somebody,

22 what do you mean by that?

23   A    Well, a lot of people have contacts in the

24 industry.  We see people at AFPM sessions or API

1   sessions so he was trying to find out, it's just, you

2   know, somebody he knows asking a question and says, hey,

3   I'd be interested in learning more about that. Can I

4   get info or was it a formal request that came from, you

5   know, somebody representing the Chemical Safety Board

6   saying I'm looking for this information for this

7   specific reason.

8        Q    Okay.  Did you guys discuss Dino any more

9   during that conversation?

10       A    No, just that that was the source where Casey

11  had heard the request from.

12       Q    Okay.  And did you know if Dino had a

13  relationship with anybody at the Chemical Safety Board?

14       A    No, I didn't.  All I knew was that Dino had

15  somehow -- the request that Casey was talking about had

16  some outcome through Dino.

17       Q    Okay.  At that point you weren't sure if it

18  was a formal request or not?

19       A    Yeah.

20       Q    When about was that conversation?

21       A    Oh boy, I couldn't tell you.  I'd have to look

22  and see.

23       Q    What was Casey's attitude about Dino talking

24  with the Chemical Safety Board?

1    A    It was just pretty matter-of-fact.  His

2    discussion with me was more do we -- was kind of a

3    question of do we even know where something like this is

4    and then, since it's Unical, can we share anything, even

5    if we find it?

6    Q    All right.

7    A    So that was kind of --

8    Q    Were you reluctant to share information about

9    the fire?

10    A    Well, not reluctant, just not knowing if I had

11    the information even or if I could share it since it was

12    another company and that's why when Casey did give me

13    the information, I sent it to our attorney and said --

14    MR. GRAY:  Well, hold it.  That wasn't his

15    question.  I don't mean to interrupt you but you're not

16    permitted to talk about any communications with your

17    attorney.  So he was just asking about your

18    communications with Casey.  Let's sort of leave it at

19    that.

20    THE WITNESS:  Okay.

21    BY MR. FRADIN:

22    Q    Okay.  So did Casey tell you that the Chemical

23    Safety Board wanted to investigate the 1984 fire?

24    A    No.

1      Q    What did he tell you that they wanted to

2  investigate?

3      A    They didn't --

4           MR. GRAY:  Objection, form, misstates his

5  testimony.

6           THE WITNESS:  They didn't want to investigate.

7  They had asked for information related to that '84 fire.

8  BY MR. FRADIN:

9      Q    Did they ask -- according to Casey during that

10 conversation, did the Chemical Safety Board ask for

11 anything else?

12     A    Not that I'm aware of.

13     Q    Okay.  So then when was the next communication

14 you had with anybody about that request from the

15 Chemical Safety Board?

16     A    Casey forwarded me some -- he went back and

17 then shortly thereafter he forwarded me an e-mail.

18     Q    Do you remember who the e-mail was from?

19     A    It was Dino was on it and I don't -- I can't

20 remember exactly who the Chemical Safety Board rep was.

21     Q    But there was a Chemical Safety Board rep also

22 on the e-mail?

23     A    It -- as I recall the e-mail -- it was like an

24 e-mail from the Chemical Safety Board to Dino asking him

1 for something that they had talked about related to the

2 '84 fire.

3     Q    When you said that they had talked about, who

4 had talked about?

5     A    The e-mail kind of referenced that Dino and

6 whoever this individual from the Chemical Safety Board

7 had talked and the Chemical Safety Board individual was

8 kind of reminding him, hey, we talked, can you get me

9 this information?

10     Q    Okay.  So when you referred to the they,

11 that's Dino and this individual from Chemical Safety

12 Board?

13     A    Correct?

14     Q    And that e-mail was from Casey Bullock,

15 correct?

16     A    Yeah, Casey forwarded that e-mail to me, I

17 believe after Dino had forwarded it to Casey.

18     Q    Did Casey say anything in that e-mail?

19     A    Just basically, you know, probably a sentence

20 or two that said, hey, here's the thing we were talking

21 about.

22     Q    Okay.  All right.  I'll ask you a little bit

23 more about your background, personally.  Have you ever

24 been arrested?

1      A    No.

2      Q    Have you ever had to hire an attorney for

3 anything?

4      A    For once on a speeding ticket.  I couldn't

5 remember.

6      Q    Are you married?

7      A    Yep.

8      Q    How many years?

9      A    1984, how many is that?  Thirty-four, thirty-

10 three-and-a-half.

11     Q    Where do you live?

12     A    Naperville.

13     Q    What's your address?

14     A    112 North Columbia, keeping in mind that any

15 communications with witness need to be through counsel,

16 so I'm not sure of the purpose of that question, but

17 please be advised as such.

18     Q    Sure.  And what's the zip in?

19     A    60540.

20     Q    All right.  Casey Bullock reports to you --

21 you indicated, correct?

22     A    Correct.

23     Q    Do you remember any communications from Casey

24 Bullock regarding the Plaintiff, Dino Arias?

1    A    Specific to --

2    Q    Specific to anything?

3    A    Yeah, I'm sure I had.  He was an employee of

4  Casey's, so yeah, I'm sure I had -- I'm just recalling

5  -- trying to recall exactly what kind of communications

6  I would have had.  A lot of communications with him

7  toward the end of Dino's employment related to his

8  incidents that he had.  His behavioral incidents.

9    Q    Couldn't hear.

10   A    His behavioral incidents that he had.

11   Q    How were those communications made?

12   A    Verbal.

13   Q    These were discussions?

14   A    Yeah.

15   Q    Over the phone?

16   A    No, probably in-person that I recall.  Our

17 offices are, you know, 40 steps from each other.

18   Q    What was the nature of the conversations?

19   A    He was kind of updating me on where the

20 investigation status was related to the incidents.

21   Q    What are the incidents?

22   A    There's an incident where after our worse-case

23 discharge drill there was a post-drill event with

24 company personnel and people that supported emergency

1  response from the drill in Chicago where Dino had

2  behaved inappropriately.

3      Q    When was this?

4      A    2014.

5      Q    Where was this drill?

6      A    The drill was local.  I can't remember if it

7  was -- there's a hotel in Romeoville, I believe, but the

8  event was at Navy Pier in Chicago.

9      Q    Do you know what day of the week it was?

10     A    No.

11     Q    Was Dino required to be there?

12     A    Dino was a participant in the drill.

13     Q    Was he required to be there?

14     A    Yeah.

15     Q    Who required him to be there?

16     A    Be required by the position that he holds in

17  the emergency response organization so the drill was a

18  worse-case discharge drill that deals with how would you

19  respond to a worse-case discharge and people, by their

20  position, have different roles in the emergency

21  response.  So anybody that had a role in our normal

22  emergency response organization was required to be at

23  the drill.

24     Q    Do you know what day of the week it was?

1      A     No.  It was a weekday but I don't know what

2  day of the week it was.

3      Q     Do you know what time it was?

4      A     The drill occurred during the day, normal

5  business hours, and then the event at Navy Pier was

6  immediately following the drill.

7      Q     Okay.  And what was the incident that you

8  speak of at the event?

9      A     The reports and the findings of the

10 investigation where Dino was drunk, loud, obnoxious,

11 insulting to other employees.

12     Q     Who was at this event?

13     A     I don't know everybody that was at the event.

14  Brian Rimbo, I remember was at the event.

15          COURT REPORTER:  Say it again?

16          THE WITNESS:  Brian R-i-m-b-o, who was the

17 Fire Chief at the time.  Joan Bingham I know was at the

18 event because one of the lewd insults that Dino made was

19 to Joan Bingham.  Robert Grachan was at the event.  I

20 was a member of our emergency response team.  I don't

21 remember if Casey was there.

22     Q     Was there alcohol at the event?

23     A     There was alcohol somewhere.  I'm not sure

24 exactly what stayed at the event.

1       Q    Is it typical that -- for Citgo to have events

2    where there's alcohol served?

3       A    Yes, there are some.

4            COURT REPORTER:  I'm sorry --

5            MR. GRAY:  Can you repeat that?

6            THE WITNESS:  Oh, the --

7            MR. GRAY:  The court reporter didn't hear you.

8    When you do that, he's having trouble hearing you and I

9    just want to make sure that he gets it all accurately.

10   BY MR. FRADIN:

11      Q    So employees are permitted to drink during the

12   work day, during work hours?

13      A    Not at the facility.

14      Q    But if you're at an outside facility, it's

15   okay?

16      A    If you're at an event.

17      Q    So intoxication that you allege, that didn't

18   violate any Citgo rules or regulations, did it?

19           MR. GRAY:  Object to form, foundation.

20           THE WITNESS:  Yes.  You are allowed to have an

21   alcoholic drink, you are not allowed to get sloppy

22   drunk.

23   BY MR. FRADIN:

24      Q    Tell me the difference?

1  A There's appropriate code of conduct.  People

2 can drink without getting sloppy drunk and insulting co-

3 workers.

4  Q Is there a written limit on how many drinks

5 they can -- a person have at a event?

6  A I don't know.

7  Q Were they specifically told at the event

8 there's a specific number of drinks they were permitted

9 to have?

10  A I don't know.

11  Q Who would know that?

12  A Somebody that was -- maybe Brian Rimbo,

13 possibly, I'm not sure.

14  Q Would Brian Rimbo have set a policy for the

15 amount of drinks that the employees could have at an

16 event?

17  A This specific event, I don't know.  He may

18 have.

19  Q If anybody were to set a policy on the drinks

20 the employees could have at an event would have been

21 Brian Rimbo?

22  MR. GRAY:  Objection, form, foundation.

23 BY MR. FRADIN:

24  Q You said yes, correct?

1        A        No, I don't know.  I don't know.

2        Q        Well, if it weren't Brian Rimbo then who would

3    it be who set that rule?

4        A        I mean, I just don't know for that event.

5        Q        Is there a rule for events in general how many

6    alcoholic beverages an employee can have?

7        A        I don't know if there's something that has a

8    specific number.  I know there's policy related to what

9    can be paid for on an expense account.  I just don't

10    know.  I just don't know specifically if there's

11    something that itemizes numbers.

12        Q        Who paid for the drinks at this event?

13        A        I don't know how that went.  I don't know a

14    lot of details about the event.

15        Q        What kind of drinks were there at the event?

16        A        I was not at the event.  I don't know.

17        Q        Who would know?

18        A        Talk to somebody at the event.  Brian Rimbo.

19        Q        Tell me about Brian Rimbo.  What was his

20    position at the time?

21        A        He was the Emergency Response Manager/Fire

22    Chief.

23        Q        What was his role at the event?

24        A        The main -- the drill itself.  The main

1  coordinator for the drill, since it's emergency

2  response, our emergency response manager.

3      Q    Did he drink at the event?

4      A    I don't know.

5      Q    Did he become intoxicated?

6      A    I don't know.

7      Q    Was anybody else investigated other than Dino

8  for behavior at this event?

9      A    Not that I -- not that I know of.

10     Q    Why did you investigate Dino?

11     A    Because there were several reports from

12 employees back to the refinery, both the refinery HSS&E

13 group, and the refinery HR group about Dino's behavior.

14     Q    At that point, how long had Dino worked at

15 that location?

16     A    I don't know.  I don't know how long Dino --

17     Q    Do you know approximately?

18     A    I knew Dino since the '90s so I'm assuming at

19 least 20-some years but he may have worked there longer

20 than that.

21     Q    You know that he was there for the 1984

22 explosion, correct?

23          MR. GRAY:  Objection, asked and answered

24 twice.

1        THE WITNESS:  Yeah, only because you told me.

2  BY MR. FRADIN:

3        Q    Okay.  So you referred to incidents.  What's

4  the other incident?

5        A    I don't -- shortly following that there was a

6  event where Dino and several individuals went to the

7  Citgo Sox suite, White Sox Park suite following an

8  informal meeting during the day with some vendors.

9        COURT REPORTER:  Excuse me, what?

10        MR. GRAY:  With some vendors.

11        COURT REPORTERS:  Oh, vendors?

12        THE WITNESS:  Yeah.

13  BY MR. FRADIN:

14        Q    When you say informal meeting, why do you say

15  informal?

16        A    I think they all had like a golf outing

17  meeting versus a formal -- formal thing inside the

18  plant.

19        Q    Was that a Citgo sponsored event?

20        A    It was an -- the meeting that he had before

21  was a vendor, I think, soliciting business and showing

22  them what kind of services they could provide.  The Sox

23  box is a Citgo sponsored, I mean, we pay for the Sox

24  box.

1      Q    The event itself was it Citgo sponsored?

2      A    I don't know for sure.  I think it was a -- it

3  was -- it may have been the vendor setting that up to

4  try to explain what their business was.  I don't know

5  the details of the day portion.

6      Q    Who was the vendor?

7      A    I don't know.

8      Q    What day of the week was it?

9      A    I don't know.

10      Q    Weekend or weekday?

11      A    Weekday.

12      Q    Do you have records of the Sox game?

13      A    Me, personally?  I don't have any records of

14  the Sox game.

15      Q    So what was the incident that occurred that

16  day?

17      A    That was an incident where my memory is that

18  Dino got very intoxicated again to the point that other

19  people had to drive his vehicle home.

20      Q    And is that why he was being investigated?

21      A    There was a investigation initiated the next

22  day.

23      Q    Isn't it wise to have somebody drive your car

24  home when you're intoxicated?

1       A    Yeah, it's wise to not drive when you're

2   intoxicated.

3       Q    Correct.  So there was alcohol provided at

4   this event -- this last event that we're talking about,

5   the golf outing and the Sox game and the -- was a

6   luncheon involved with that event as well?

7       A    I don't know.  I don't know.  I know there's

8   alcohol available at the Sox suite, I know that.

9       Q    Was Dino required to go to this event?

10      A    I think he was asked to go to the event.

11      Q    Who asked him to go to the event?

12      A    I don't know.

13      Q    And when he was asked to go to the event it

14  was known that there would be alcohol at the event?

15      A    I don't know.  I didn't ask.

16      Q    Did anyone talk to Dino about his use of

17  alcohol at the event?

18           MR. GRAY:  Objection, foundation.

19           THE WITNESS:  Yeah, I don't know.

20  BY MR. FRADIN:

21      Q    So he was asked to go to an event where Citgo

22  knew that alcohol would be available, correct?

23           MR. GRAY:  Objection, form, foundation.

24           THE WITNESS:  I don't know.  Whoever asked him

1    -- I don't know if they knew for sure that the Sox suite

2    had alcohol available.

3    BY MR. FRADIN:

4         Q    Okay.  What about at the luncheon.  Was there

5    alcohol at that event?

6         A    I don't know.

7         Q    Okay.  So he already, according to your

8    testimony, been spoken to or investigated for alcohol

9    use, correct?

10        A    Correct.

11        Q    Now, how much time elapsed between the first

12   investigation for Dino's alcohol use and the second

13   investigation?

14        A    I don't remember exactly.  It was short

15   duration though.  It might have been a month, somewhere

16   in that neighborhood.

17        Q    In hindsight, do you think it was a good idea

18   to ask Dino to go to an event where there would be

19   alcohol readily available knowing that just one month

20   earlier there had been an incident involving alcohol?

21             MR. GRAY:  Objection, form, foundation.  Asked

22   and answered.

23   BY MR. FRADIN:

24        Q    You can answer the question if you understand

1   it.

2       A    I guess I don't understand it.  Would it be

3   wise for Dino to misbehave a second time, no.  But

4   somebody else asking him being responsible for his

5   behavior that doesn't -- that seems to throw the

6   responsibility that the individual has to somebody else

7   and the responsibility is his for how he behaves and how

8   much alcohol he consumes if he representing the company.

9       Q    Was that a -- strike that.  What do you mean

10  when you say representing the company?

11      A    He -- he -- the reason he was going to the Sox

12  suite was as a -- he was going to the Citgo Sox suite as

13  one of the Citgo representatives in the suite.

14      Q    Do you track hours of employees -- what they

15  work for Citgo?

16          MR. GRAY:  Objection, form, foundation.

17

18          MR. FRADIN:  Let me rephrase it.

19  BY MR. FRADIN:

20      Q    Do you know if Citgo tracks the hours that

21  their employees work for Citgo?

22          MR. GRAY:  Objection, form, foundation.

23  BY MR. FRADIN:

24      Q    You can answer if you understand the question.

1    A    Inside the facility we have a system that

2  tells you exactly how long a period of time somebody is

3  in and out of the facility because they're required to

4  barcode in with their badge.

5    Q    Were these hours at the Sox game tracked for

6  Dino as working hours?

7         MR. GRAY:  Objection, form, foundation.

8         THE WITNESS:  He's a supervisor.  We don't

9  specifically track his hours.

10 BY MR. FRADIN:

11   Q    But you do track his hours inside the

12 facility, correct?

13   A    His hours are recorded inside the -- inside

14 the facility because there's a barcode that

15 automatically does that but that's not used for any

16 timekeeping purposes for supervisors.  So we know who is

17 in and out of the facility.

18   Q    So is there any timekeeping for supervisors?

19   A    Supervisors fill out a exception report on a

20 monthly basis defining their exceptions to the --

21 vacation, illness, but there's nothing that tracks that

22 says every day I worked eight, eight, eight.  There's

23 nothing like that for supervisory.

24   Q    Okay.  To make out this exception report --

1        A     It's just a simple spreadsheet, some type of

2    software system where you go in and you can pick from a

3    pick list to say here's the -- I had five days of

4    vacation in a row so I had eight hours of vacation on

5    these calendar dates, or I had two days of illness

6    absent, or I had, you know, two days of carry-over

7    vacation from the prior year.  And then you submit that

8    to your supervisor for approval at the end of the month.

9        Q     Okay.

10       A     But it's an exception recorded versus --

11       Q     You don't pay anything extra to attend the Sox

12   game?

13       A     I don't think so.

14       Q     What time of day or evening was the Sox game?

15       A     Sox games are usually 7:00 o'clock-ish, 7:30,

16   so it must have been in that timeframe.

17       Q     So they might be going until maybe what, 11:00

18   o'clock at night or something?

19       A     Yeah, 10:30, 11:00.

20       Q     So was Dino given any extra consideration or

21   any extra pay for being at this event until 11:00 at

22   night?

23       A     I doubt it?

24       Q     Let me show you what I have marked as Exhibit

1  F-1 for identification.

2         MR. GRAY:  Do you have two copies or just one?

3         MR. FRADIN:  I have just that one for now

4  because we have got a second deposition coming up so I'd

5  like to keep this stack.

6         MR. GRAY:  Okay.  We haven't Bates labeled

7  these.  These are just the pictures?

8         MR. FRADIN:  They were Bates labeled and

9  produced but these -- this particular set is not Bates

10  labeled.

11         MR. GRAY:  Okay, but I just want you -- these

12  aren't the ones that were produced?

13         MR. FRADIN:  These are the ones that were

14  produced.

15         MR. GRAY:  Okay, great.

16  BY MR. FRADIN:

17     Q    Have you seen these photographs before?

18     A    Nope.

19     Q    Can you identify the individual --

20         MR. GRAY:  He's asking you, by the way, first

21  of all, this is a multi-page document.  He's asking you

22  about the entire thing so if you haven't seen it I

23  suggest you take a look at it, whether you want to look

24  at it or not, it's a different story.

1    BY MR. FRADIN:

2        Q    Can you identify these photographs.

3            MR. GRAY:  He just said he's never seen them

4    before.  How can he identify them.  I object to form and

5    foundation.

6    BY MR. FRADIN:

7        Q    Can you identify anybody in the photographs?

8        A    Maybe a couple of them.  And whichever

9    photograph number this is, that's Brian Rimbo and Brian

10   Rimbo is also in the next photograph and the next one,

11   and whichever -- three photographs is Brian Rimbo.  I

12   don't know who that guy is.

13       Q    Why don't you go ahead and circle Brian Rimbo.

14       A    That's the only one I recognize.  That's only

15   in those three photographs.

16           COURT REPORTER:  Can you speak a little

17   louder?

18           MR. GRAY:  He can't hear you.  He's -- you

19   just --

20           THE WITNESS:  Only in these three photographs.

21           MR. GRAY:  Okay.

22           MR. FRADIN:  Let the record reflect that the

23   witness circled Brian Rimbo in three of the photographs.

24

1    BY MR. FRADIN:

2        Q    Brian Rimbo is who replaced the Plaintiff,

3    Dino Arias, in his position, correct?

4        A    Eventually, not immediately.

5        Q    And you had testified earlier that Dino had

6    been investigated for intoxication at two separate

7    events, correct?

8        A    Yes.

9        Q    These photographs were taken at the Tilted

10   Kilt at this second event that you described.  Can you

11   describe what the photographs show?

12           MR. GRAY:  Objection, form, foundation.

13   Misstates the testimony.  He said he's never seen these

14   before so he's supposed to tell you what you just

15   testified to that these were at a place.  He said he

16   hasn't seen them before.

17           MR. FRADIN:  I just asked him to describe the

18   photos.

19           THE WITNESS:  There's people standing with

20   women who, I'm assuming, they have uniforms on.  I'm

21   assuming they must work at the location because they all

22   have the same uniform.

23   BY MR. FRADIN:

24       Q    Have you ever been to Tilted Kilt before?

1     A    No.

2     Q    I want you to look at the three that you

3 circled with Brian Rimbo in them.  Can you describe the

4 first one -- the first photograph?

5     A    Brian Rimbo is standing with three women.

6     Q    How are the women dressed?

7     A    Smiling, in the same uniform.

8     Q    Can you describe their uniforms?

9     A    They're, apparently they're Tilted Kilt

10 uniforms, you know, short top, showing a lot of

11 cleavage, bare mid-riffed, and I can't tell whether they

12 got shorts or skirts on.

13     Q    So, if this were the luncheon for that event

14 is this the sort of event that Citgo requires it's

15 employees to go to?

16     MR. GRAY:  Objection, form, foundation,

17 misstates to the evidence and testimony.

18     MR. FRADIN:  Well, let's back up.

19 BY MR. FRADIN:

20     Q    Do you have any reason to believe that these

21 photographs are not from the luncheon on the date of the

22 second incident that you testified to earlier?

23     MR. GRAY:  Objection, form, foundation.

24     THE WITNESS:  I've never seen them so to say

1  whether they're from that day or another day, I don't

2  have any knowledge to know other than you gave them to

3  me as an indication that they were but I don't know.  I,

4  I haven't seen them before so --

5  BY MR. FRADIN:

6       Q    Now there's one photograph, second from the

7  last, there's an individual with a beard, a man, and can

8  you describe the hat that he's wearing?

9       A    The hat that says Fire-Aide.

10      Q    Do you know who Fire-Aide is?

11      A    No.

12      Q    Do you know if Fire-Aide was the contractor

13  that was being -- strike that.

14           Do you know if Fire-Aide was the contractor

15  that was involved with the second event?

16      A    I don't know.

17      Q    On the top photograph, do you recognize the

18  hat that the individual is wearing?

19      A    It could be a Citgo hat.  I can't tell.

20      Q    And is that --

21      A    No.  I can't tell.

22      Q    On the second page, there's a picture of an

23  individual, what's the hat that that individual is

24  wearing?

1          A     That one is a Citgo hat.

2                COURT REPORTER:  I can't hear you, what?

3                THE WITNESS:  That one is a Citgo hat.

4   BY MR. FRADIN:

5          Q     Do you know if alcohol is served at Tilted

6   Kilt?

7          A     I've never been to Tilted Kilt.  I would

8   assume, it's a restaurant.  There aren't too many

9   restaurants that don't serve alcohol.  I assume there

10  was alcohol.

11         Q     Do you know if Brian Rimbo set limits for the

12  amount of alcohol that the Citgo employees were to drink

13  at the Tilted Kilt?

14               MR. GRAY:  Objection, form, foundation.  I'll

15  let you ask two more and then we can call the Judge on

16  this, okay?

17               MR. FRADIN:  Okay.

18               MR. GRAY:  He said he wasn't there.  He said

19  he's never been to Tilted Kilt.  He said he wasn't there

20  with them.  Now you're just being harassing, okay?  We

21  can get the Judge on the phone and read it through, but

22  he's already said five times he wasn't there, he doesn't

23  know, he's never even been there.  Now you're just doing

24  it to be a bully.

1          MR. FRADIN:  You're making it tough for

2     speaking --

3          MR. GRAY:  No, I understand.  I'm just warning

4     you that much like your behavior last time, I will be

5     glad, we'll call, we'll break it right now.  We'll take

6     the transcript to the Court and we'll let the Court say

7     what he says.  I wasn't there, I've never been there,

8     and then you're asking what did a person say to an event

9     that he wasn't at, et cetera.  Well, you're just doing

10    it to be difficult.

11         MR. FRADIN:  You're just making speech --

12    trying to coach him.

13         MR. GRAY:  What's the coaching?  The coaching

14    is he keeps saying, I don't know, I wasn't there.  I

15    don't know, I wasn't there.  You're just doing this to

16    be harassing.  So anyway, that's the point, I'm warning

17    you, next one, we'll cut it off, we'll call the Judge

18    and I'll ask for fees.

19         MR. FRADIN:  What was the last question?

20         MR. GRAY:  I can tell you what the last

21    question was.  What did Brian Rimbo say to Dino at the

22    Tilted Kilt?

23         MR. FRADIN:  That wasn't the question.

24         MR. GRAY:  Yeah, it was.  Do you know what

1   Brian Rimbo said to Dino Arias at the Tilted Kilt?

2            MR. FRADIN:  Can you read the last question?

3                     (Whereupon the record was read

4                      by the reporter as requested.)

5            MR. FRADIN:  You can answer the question.

6            MR. GRAY:  You can answer the question.

7            THE WITNESS:  I don't know.

8            MR. GRAY:  Thanks.

9   BY MR. FRADIN:

10       Q    Earlier you testified that if anybody were to

11  have set limits as the alcohol use at the event, it

12  would have been Brian Rimbo, correct?

13       A    No.  I said  -- you asked me if Brian Rimbo

14  had set limits and I said I didn't know.

15       Q    No.  I asked who would have set limits and you

16  said Brian Rimbo, if anybody, correct?

17       A    I don't think I said that.  I think I said

18  something to the effect of maybe Brian Rimbo but I

19  really don't know.

20       Q    Okay.  But just we're clear, that's the same

21  Brian Rimbo who is in these photographs, correct?

22       A    Correct.

23       Q    Let me show you what I have marked as E-1.  Do

24  you recognize these photographs?

1      A    Nope.  I only looked at the first one.  I'll

2  look at some more maybe I'll recognize -- are these the

3  only --

4      Q    Look at the three photographs in B, E-1, 2,

5  and 3.

6           MR. GRAY:  So he's just telling you, the first

7  three pages, he answered no.

8           THE WITNESS:  I haven't seen them before.

9  BY MR. FRADIN:

10     Q    You testified earlier that the Chemical Safety

11 Board had made an inquiry into the 1984 explosion,

12 correct?

13          MR. GRAY:  Objection, form, foundation,

14 misstates his testimony.

15 BY MR. FRADIN:

16     Q    Is that correct or not?

17     A    I stated that I was, I received verbal

18 communication and then e-mail from Casey Bullock showing

19 me that there was an e-mail between Dino and somebody at

20 the Chemical Safety Board asking if they could get some

21 information regarding the 1984 Unical fire.

22     Q    Okay, and --

23     A    I don't remember if that was --

24     Q    These photographs, do you know if they

1    accurately depict the aftermath of the 1984 fire?

2            MR. GRAY:  Objection, foundation.

3            THE WITNESS:  I didn't know they were from the

4    1984 fire until you said that, but --

5            MR. GRAY:  Remember, he's not testifying so we

6    don't know what he says is true or not true.

7            THE WITNESS:  These could be, I mean, there

8    was a lot of damage.  Those could be representative

9    right at the fire area but I've never seen those before,

10   so I don't know where they fit in, if there's a whole

11   panacea of hundreds of photographs and those are real

12   small snapshots, so I don't know how representative they

13   are of the whole thing.  I mean those are pretty close

14   up things.

15   BY MR. FRADIN:

16       Q    Did you know that Dino picked up the body

17   parts from the explosion of his co-workers.

18           MR. GRAY:  Objection, form, foundation.  He's

19   already testified he didn't meet Dino until the '90s.

20   You want to continue to waste everybody's time, that

21   works.  You can answer the question.

22           THE WITNESS:  Okay, I didn't know that.

23   BY MR. FRADIN:

24       Q    Okay.  Can you identify the document that

1   starts on page four of Exhibit E-1?

2   A    It's a document from the State Fire Marshall

3   and it says it's a technical information bulletin

4   prepared by Packer Engineering.  There's no title that

5   defines it.  It's only information from the first

6   paragraph.

7   Q    Okay, do you know if this document was

8   provided to Roger Evans of the Chemical Safety Board?

9   A    I don't know.

10   Q    Do you know if Roger ever was seeking this

11   document from Citgo?

12   MR. GRAY:  Objection, form, foundation.  Asked

13   and answered at least four times.

14   BY MR. FRADIN:

15   Q    Did you ever receive any communications from

16   Roger Evans or from anybody at Citgo that Roger Evans

17   was seeking this report?

18   MR. GRAY:  Objection, asked and answered.  Go

19   ahead.

20   THE WITNESS:  The communication I got did not

21   specifically -- didn't have any specific report request.

22   I just remember seeing something that's, I don't

23   remember the exact statement but it was something to the

24   effect of, can I get information on the 1984 fire.  I

1    don't know what information but I don't remember it

2    being a lot of detail with some specific request for a

3    specific document or report.  I don't -- it wasn't an

4    eventful request that I remember much about.

5    BY MR. FRADIN:

6        Q    I'm going to ask you to move on to what's

7    marked as Exhibit E-13.  Do you know if these photos

8    accurately depict the aftermath of the 1984 explosion?

9            MR. GRAY:  Objection, foundation.

10           THE WITNESS:  Since I don't know -- I don't

11   really know their origins, I don't know.  And they're

12   close-ups so that, you know, it's hard to say.

13   BY MR. FRADIN:

14       Q    Do you know if any of these photographs were

15   provided to Roger Evans in response to his inquiry?

16       A    I don't know.

17       Q    Do you know what the purpose of Roger Evans'

18   inquiry was?

19           MR. GRAY:  Objection, foundation.  I don't

20   know if he's asking about these pictures right now.  He

21   stopped on that -- he's not asking you a question.

22           THE WITNESS:  I don't know what the purpose of

23   the inquiry was and I don't know that it was an inquiry.

24   It was a question to Dino, so I don't know.

1    BY MR. FRADIN:

2         Q    Okay.  Did you ever talk to Dino directly

3    about Roger Evans?

4         A    No.

5         Q    Did you ever talk to Dino directly about

6    safety at the facility?

7         A    No, not specific, you know, we may have spoken

8    about, he was organizing a safety picnic or something,

9    so he would have come and talked to me about, hey, can I

10   spend this much money on it, I'd like to do this.  But

11   nothing, you know, consider that something to support

12   safety but I don't remember ever specifically having a

13   conversation with him about a specific safety event or

14   investigation or anything like that.

15        Q    Okay.  What about discussions with Casey

16   Bullock?

17        A    Yes.  All the time.

18        Q    What were the nature of those conversations?

19             MR. GRAY:  Objection, form.  All -- you're

20   asking the nature of all his conversations with Mr.

21   Bullock over -- he testified he started working with him

22   15 years ago.  So your question is to describe every

23   conversation in the last 15 years?

24             MR. FRADIN:  I'm asking to give an overview.

1   Like he --

2           MR. GRAY:  Of every conversation in the last

3   15 years?

4           MR. FRADIN:  Yes.

5           MR. GRAY:  Objection, form, foundation,

6   harassing.

7           THE WITNESS:  I can try to answer but it will

8   be a very big picture summary but Casey will talk to me

9   about anything from process safety management audit

10  that's coming up and who is going to be involved to

11  people who are going to off-site training events of

12  various types to safety issue that we're following up in

13  the plant related to something that we observed the

14  contractor doing, and here's how we're correcting that.

15          Or, you know, speaking of the contractor to,

16  here's, you know, a multi-site team that I'm on that's

17  developing a new safety standard for some area.  Here's

18  the status update for that.  You know, I mean, anything,

19  anything that, you know, Casey's responsible for the

20  safety department and the medical department.  It could

21  be -- here's a medical follow-up issue that we have

22  related to an employee that's off, you know, I mean, the

23  gambit.  It could be anything.

24

1   BY MR. FRADIN:

2        Q    Is there anybody else between you -- besides

3   you and Casey who would be involved in conversations

4   regarding safety at the facility?

5        A    Oh, everybody that, I mean, that the way we

6   look at it, everybody in the facility is a safety

7   professional of some kind.  Operators talk to me about

8   safety when I go out and visit the operating shelters.

9   Maintenance supervisors, engineers, engineering

10   managers, people that are setting up safety plans for

11   various construction -- I mean, it's not a real formal

12   thing.  When it comes to safety, it's everybody's job,

13   so anybody will search for an opinion that will help

14   them come up with a better plan or a better process or a

15   procedure, so it could -- I, you know, literally could

16   be anybody and the facility contractors as well.

17        Q    So did you talk to anybody else other than

18   Casey about the CSB inquiry?

19        A    The only --

20             MR. GRAY:  Objection, form, foundation.

21   Misstates testimony yet again and misstates his -- the

22   evidence, and asked and answered.  I count now five

23   times.

24             THE WITNESS:  Casey was the only person that I

1  talked to.

2

3          COURT REPORTER:  Was the only person that

4  what?

5          THE WITNESS:  Casey was the one person that I

6  talked to about that CSB question to Dino Arias.

7  BY MR. FRADIN:

8      Q    Okay, I'm going to ask you to look at Exhibit,

9  what's marked as Exhibit G.

10     A    Is that in this?

11     Q    No.

12     A    Any specific part of this?

13     Q    I'm going to ask you to look --

14          MR. GRAY:  So you're Exhibit B is a Group

15  Exhibit of a bunch of documents out of order?  Do I have

16  a copy?

17          MR. FRADIN:  That copy right there.

18          MR. GRAY:  So you're not providing me a copy?

19          MR. FRADIN:  There's a copy in your hand.

20          MR. GRAY:  That's the one you gave the

21  witness.

22          MR. FRADIN:  I'm giving it to you.

23          MR. GRAY:  So you're not giving one to the

24  witness?

1          MR. FRADIN:  I'll give one to you and --

2          MR. GRAY:  Well, you just asked him -- tell me

3     what this is.  It's got to be what, 75 pages with

4     handwriting on it?

5          MR. FRADIN:  I'll give this to you but I need

6     it -- just so we don't have to make so many copies with

7     the next deposition, if I can get it back.

8          MR. GRAY:  But this one says G-1, G-14, G-32,

9     G-28, 20, 29.  I don't understand what this exhibit is.

10          MR. FRADIN:  Take a look at it.

11          MR. GRAY:  No, I am looking at it.  It's

12     exhibit --

13          MR. FRADIN:  Give me an opportunity to ask him

14     questions, please.

15          MR. GRAY:  No, no.  You give our witness 60

16     pages worth of documents, so you want him to spend the

17     next hour reading it?

18          MR. FRADIN:  No, just let me ask a question

19     about it, please.

20          MR. GRAY:  About?

21          MR. FRADIN:  About a document within that

22     array of e-mails.

23          MR. GRAY:  So you're just asking -- then tell

24     him what document, allow him to review it.

1          MR. FRADIN:  Give me an opportunity to do

2     that.

3          MR. GRAY:  No, no, you said -- you already

4     started to ask your question about 60 pages that you've

5     cobbled together, hopefully, probably trying to trick

6     him into something that he hasn't seen yet.  Tell him

7     what to review, he'll get to do it.  But that violates

8     the rules, you know, the rules that govern lawyers.

9          MR. FRADIN:  You've got to take it easy and

10    stop --

11         MR. GRAY:  No, no, you've got to follow the

12    rules.  Okay.

13         MR. FRADIN:  We're not going to -- if you want

14    to get to -- you said the next one at 2:30, you're going

15    to have to stop interrupting me.

16         MR. GRAY:  You're not asking any questions

17    that are relevant.  You're asking him multiple questions

18    about stuff he doesn't know about just to try to make

19    some point.  If you, by the way, this is the only day

20    you're getting Mr. Albaugh, and we're getting out of

21    here, so you better --

22         MR. FRADIN:  Then you better stop interrupting

23    then.

24         MR. GRAY:  By the way, the record will be

1    clear.  We'll take it to the Judge.  You and I will go

2    to the Judge.  We'll take the pictures where you're

3    trying to embarrass the witness by pictures from your

4    client's phone of women in scantily -- we'll go to the

5    Judge and we'll present that behavior.  You name the day

6    and we'll see how it ends up for you or me.

7            MR. FRADIN:  This isn't your deposition,

8    really, this is his deposition.  You've got to stop --

9            MR. GRAY:  No, no.

10           MR. FRADIN:  -- you're talking more than he's

11   talking.

12           MR. GRAY:  That's fine, that's fine.  I'll

13   give you a little bit more time then we'll go to the

14   Court.  You can show up dressed like you are.  Before

15   you go, make him tell you the page.

16           MR. FRADIN:  We'll take a look at what's

17   marked Exhibit G-16.  You're telling me about the -- you

18   laughed while my client was crying during his deposition

19   when he was discussing cleaning up the body parts of 17

20   bodies.  You laughed.

21           MR. GRAY:  This has nothing --

22           MR. FRADIN:  Don't you ever talk to me

23   about --

24           MR. GRAY:  This has nothing to do with

1   anything.  This is how -- wait -- this isn't how

2   lawsuits are handled.  It's not how lawyers behave.

3   That has nothing to do with anything.  It has zero to do

4   with anything.  You're asking Mr. Tancredi, he drove an

5   hour-and-a-half to be here -- he's -- he has a job, he's

6   told you what it is.  He has had some interaction with

7   Mr. Bullock and Mr. Arias.  As him about that stuff.

8   Don't ask about pictures that he's never seen before,

9   don't start talking about what happened at Unical in

10  1984.  Ask him about why it's relevant.  And if you have

11  a problem with that, let's go to the Judge, take the

12  transcript, and we'll see what she's --

13      MR. FRADIN:  Meanwhile, you're on your phone

14  the entire time talking about, you know, what I'm

15  wearing.  What does that have to do with anything?  Why

16  would you even mention that when you're on your phone

17  laughing while my client is crying during his deposition

18  so don't ever say anything to me again about deposition

19  decorum.

20      MR. GRAY:  If you conduct yourself the way --

21  I will not say anything.  If you're trying to bully and

22  harass our witnesses, I'm going to say something.

23      MR. FRADIN:  Nobody harassing.  My client was

24  crying and you were laughing at him and you're telling

1   me by asking him questions, I'm harassing him?

2          MR. GRAY:  I was not laughing, I was smiling,

3   and I was smiling at you and the way you were handling

4   yourself.  That's what was going on, okay?  That's what

5   was happening.  I didn't laugh.  There's a recording --

6          MR. FRADIN:  You were laughing.

7          MR. GRAY:  There's a recording, we'll see if

8   there's laughing.  I guarantee there's no laughter on

9   it.  I was smiling because --

10         MR. FRADIN:  It shows your personality and it

11  shows Citgo's, it's reflective as well.

12         MR. GRAY:  Absolutely.  You're talking about

13  something that's nothing to do with anything, trying to

14  be -- like we're on television.  I'm saying let's get

15  down to it.

16         MR. FRADIN:  You think the 1984 explosion has

17  nothing to do with this lawsuit?

18         MR. GRAY:  I know for a fact that 1984

19  explosion that was at a company multiple times before

20  Citgo, well before he was employed by Citgo, has nothing

21  to do with the fact that your -- your client was abusive

22  to multiple people and got fired for it.  Excuse me,

23  resigned before he got fired.  That's what the case is

24  about.  But you want to make it about anything else.

1   We'll talk about it another time.

2          MR. FRADIN:  Well, keep your testimony on the

3   record that he got fired, thank you for that, counsel.

4          MR. GRAY:  That's right.  The problem is it's

5   not about your trickery it's about what the witnesses

6   say.

7          MR. FRADIN:  It's not about trickery.  If you

8   want to talk on record and then what you say on the

9   record goes on the record.

10          MR. GRAY:  Sure, go right ahead.

11          MR. FRADIN:  You said that he was fired, thank

12   you for that.

13          MR. GRAY:  Absolutely.

14   BY MR. FRADIN:

15     Q    All right, I'm asking for -- to take a look at

16   Exhibit G-16.  Do you recognize that document?

17     A    Yes.

18     Q    Can you identify it?

19     A    Yeah, it's a request for e-mails related to a

20   request that our corporate HSS&E staff learned there was

21   going to be a request made throughout the industry from

22   the Chemical Safety Board to various locations and he

23   was providing us with a heads-up and some background

24   information to say hey, here's what I know about this

1    request that's coming.  And then the final e-mail on

2    this is me letting Casey Bullock and Ray Boutte know,

3    because they were the likely people to receive the

4    request based on the information that was provided by

5    both the AFPM and our corporate people that they had

6    asked the CSB -- the CSB had asked for the names of the

7    process safety management coordinators so that would --

8    Ray Boutte is that individual at our site.  So I sent

9    him and Casey Bullock this e-mail to let him know, hey,

10   you may see this request per this e-mail string.

11        Q    Now, was that the same request from CSB that

12   you were discussing earlier?

13        A    No.

14        Q    Okay, what's the difference between the two?

15        A    The one earlier was simply looked to be an

16   information conversation of some kind from Dino related

17   to a specific event that had happened at Unical in 1984,

18   whereas this request was a Chemical Safety Board going

19   industry-wide looking for information on a whole bunch

20   of different incidents that had occurred.  So this was a

21   global refining request.

22        Q    Okay, do you know the timeframe of the two

23   incidents -- strike that.

24             Do you know the timeframe of the two requests?

1    A    This one -- just because I'm looking right at

2    it, is April 2104.  The other one I don't.  I don't

3    remember what that timeframe was.

4    Q    Do you know if it was before or after this

5    request?

6    A    I'm thinking it was before but without looking

7    at a document that specifies -- that thing -- this was

8    something that I ended up doing some work to get

9    information on so I remember it.  The other one was gone

10   in the blink of an eye.  It was a verbal conversation

11   and then here's the e-mail on that and then nothing ever

12   became of that.  So I don't recall that one.

13   Q    Okay.  When you say nothing ever came of it,

14   do you know why nothing ever became of that?

15   A    This -- I -- when I got the information

16   basically I did forward it to corporate attorney to

17   say --

18        MR. GRAY:  Objection, he's asking about if it

19   implicates communications with counsel.  I'm directing

20   you not to answer it.  If you can answer Mr. Fradin's

21   question --

22        THE WITNESS:  I can't answer without saying

23   that --

24        MR. GRAY:  Well, hold on here.  So you -- the

1  point is, you can't disclose your communications with

2  counsel.

3         THE WITNESS:  Yeah.

4         MR. GRAY:  If you can answer the question

5  outside of that I want you to do it but you can't --

6         MR. FRADIN:  I can, yeah.  The request came to

7  as no subsequent request after -- we didn't deliver

8  anything from the refinery.  I don't even know if we had

9  the information since it was from Unical's days.  But I

10  know we didn't deliver anything from the refinery and we

11  never received a subsequent request to say I'm looking

12  for the information so it just kind of went away.

13  BY MR. FRADIN:

14      Q    Okay.  I'm going to ask you to look at Exhibit

15  G-14.  Can you identify that e-mail?

16      A    Let me read it for a second.

17         MR. GRAY:  Objection, form.

18  BY MR. FRADIN:

19      Q    Can you identify this document?

20      A    It's a -- and the title kind of explains it

21  pretty well.  It's an e-mail regarding Dino's Arias'

22  work restrictions being revised on December 18th, 2013.

23      Q    Do you know why you were copied on this e-

24  mail?

1    A    All e-mails of this type -- there are from

2    time-to-time employees have medical limitations for

3    whatever reason, illness, injury, something they did at

4    home.  When they do our medical department can't give us

5    the medical background for why they have certain

6    symptoms but they will then let the direct supervisor

7    know and then generally the direct supervisor's

8    supervisor is also copied on the list as well as HR to

9    say this individual that reports to you has these

10   physical restrictions, can you accommodate, basically,

11   can they perform work or do I have to tell them they're

12   off on sick leave because they're restricted too much to

13   do the basic functions of their job.  So this is kind of

14   a standard document.  Since it's Dino it went to Casey

15   and then HR and I was copied.

16   Q    Do you know why Dino's work restrictions were

17   changed?

18   A    From the document it appears because he saw

19   Dr. Metro at 11:30 a.m. on December 17th.  Because the

20   subsequent e-mail speaks to -- here's what the

21   restrictions are revised to.  Don't know that for sure

22   but that's how the document seems to flow.

23   Q    You see the document marked G-35?  Can you

24   identify that document?

1    A    Yes, this is to the document we were

2    referencing just a short while ago.  This is Casey

3    Bullock's response to my -- my -- I gave him the heads

4    up, saying hey, you could expect to receive a request

5    from the Chemical Safety Board related to this industry-

6    wide request they were making and it's Casey Bullock's

7    response basically telling me he had not received any

8    such request as of this time.

9    Q    And then could you take a look at G-37.  Can

10   you identify that document?

11   A    Okay.  Yes, this is on that same topic.  It

12   was a Chemical Safety Board request that corporate had

13   sent me the heads-up on and then I relayed that heads-up

14   to Casey Bullock and Ray Boutte and this is Ray Boutte's

15   response to me basically telling me that he did see --

16   receive a request from the Chemical Safety Board 15

17   minutes ago.

18   Q    And you responded with what?

19   A    Great news.

20   Q    What did you mean by that?

21   A    I don't know but that we actually got, you

22   know, it's kind of closure.  We were saying that we

23   should receive one and we now have one.

24   Q    You really did feel as if it was great news?

1       A    I don't know.  It was several years ago so I

2    don't -- I don't know.

3       Q    But you sent that e-mail, right?

4       A    Yep.

5       Q    Do you remember sending it?

6       A    No.  I remember getting information back from

7    Ray telling me that he received the request.  I didn't

8    remember if I responded or not.  It looks like I gave

9    him a two word response.

10      Q    But as far as your recollection is concerned

11   you were sincere in that you believe that it was great

12   news?

13      A    I don't know what I was -- I was glad that we

14   had actually heard something because we had just seen a

15   lot of information from corporate and AFPM saying that

16   the request was coming so we got our request.

17      Q    And I ask you to take a look at exhibit marked

18   G-30.  Now, can you identify that document?

19      A    Yeah, this appears to be that request that we

20   talked about earlier where Casey told me that Dino had a

21   request from the Chemical Safety Board for some

22   information related to the 1984 Unical event.

23      Q    Okay.

24      A    And --

1     Q    And tell me what does Casey say to you?

2     A    This is someone from CSB that Dino knows.  Not

3    sure what their objectives are.

4     Q    Okay.  Who is their in that sentence?

5     A    I don't know.  I'm assuming he's talking about

6    the Chemical Safety Board because that's who's

7    referenced as the third-party but I don't know for sure.

8    It's Casey's e-mail but --

9     Q    It could have been Dino and Roger Evans,

10    correct?

11    A    It could have been anybody.  I just don't

12    know.

13    Q    So it's a reasonable interpretation that not

14    sure what their objectives are -- their refers to Dino

15    and Roger Evans, right?

16         MR. GRAY:  Objection, form, foundation.

17    Misstates his testimony.

18         THE WITNESS:  And I wouldn't say -- I would

19    say my initial assumption would always be that when

20    we're saying their we're referring to the third-party,

21    so if somebody from the Chemical Safety Board is asking

22    for something we would more likely refer to them as

23    their and more likely refer to somebody like Dino, who

24    was an employee, as our, but that's my guesstimate,

1 speculation so, but that's what -- that's what would be

2 more common.

3 BY MR. FRADIN:

4      Q    What makes you say that would be more common?

5      A    Because there is somebody else, our is, we

6 consider us.  We're Citgo.  Somebody from Citgo received

7 a request.  That's a request to us and it came from

8 them.  That's just --

9      Q    So they -- their implies an outsider to an

10 extent --

11      A    That's probably -- yeah -- on something like

12 this, that's what I would assume.

13      Q    So if by their he did include Dino that would

14 imply that Dino was, at that point, somewhat of an

15 outsider, correct?

16           MR. GRAY:  Objection, form, foundation,

17 misstates his testimony.

18           THE WITNESS:  That would be speculate.

19 BY MR. FRADIN:

20      Q    Did you respond to this e-mail?

21      A    I don't think so.

22      Q    Did you search your e-mail before --

23      A    Yeah, I searched and I didn't see any

24 response.

1    Q    Did you find this e-mail in your search?

2    A    I did not find this one.  I would -- this one

3  I got shown.  I found the other Chemical Safety Board

4  one.

5    Q    Did you look at this e-mail before the

6  deposition?

7    A    Yeah.

8    Q    When did you look at it?

9    A    Man, I don't even remember for sure.

10    Q    Who showed it to you?

11    A    Man, I -- I don't remember when I saw this.

12    Q    Was it after the litigation was initiated?

13    A    I think so because there would be no other

14  reason that -- I mean this was such a nothing that

15  that's the only reason I remember even seeing this was

16  that this somehow was coming up in the litigation

17  because otherwise this thing was to me nothing.  So I

18  didn't even remember it.

19    Q    So this would have been within the last few

20  months that you talked about it with somebody else?

21    A    Probably or within the last year anyway --

22    Q    Do you remember where you were?

23    A    At the refinery but I really don't remember.

24  I just remember that this came up and I was trying to

1  figure out why this even came up.

2      Q    Did you talk to this person about the word

3  their in this e-mail?

4      A    No.

5      Q    Did you talk to this person about this e-mail

6  at all?

7           MR. GRAY:  Could we establish who this person

8  is?

9           MR. FRADIN:  Well, he doesn't remember --

10           MR. GRAY:  Well, if he doesn't remember, so if

11  he doesn't know who it is -- if it's a lawyer you're

12  directly going in to attorney/client privilege

13  communications.  He just said he doesn't know who the

14  person is.  So, right?

15           MR. FRADIN:  He can answer if he remembers the

16  conversation with this person.

17           THE WITNESS:  Yeah.

18           MR. GRAY:  But he just said he doesn't and so

19  now you're asking --

20           MR. FRADIN:  But he can't remember who the

21  person is --

22           MR. GRAY:  Right.

23           MR. FRADIN:  -- that doesn't mean he doesn't

24  remember.  Well, okay, let's back --

1          MR. GRAY:  Let's just make sure -- if it's a

2    lawyer you're not asking him --

3    BY MR. FRADIN:

4          Q     Was it a male or a female?

5          A     I don't know.  This thing to me was so small

6    that I just don't remember much.  I just remember being

7    shown this -- do you remember this -- did anything ever

8    come of this?  I just remember saying no, I -- I looked

9    at it and I said, yeah, I kind of remember when they

10   asked but this -- nothing ever happened.

11         Q     Do you remember where you were when the person

12   asked you about this?

13         A     No.  It would have been at work because

14   there's no place else this would have come up.  I just

15   don't remember.

16         Q     Did any person within an attorney or someone

17   along those lines come to your work at any point so that

18   this communication we're talking about might be

19   privileged.

20         MR. GRAY:  Objection, form, foundation.  Wait

21   a second.  I -- he's not sure about the conversation

22   you're asking about.  It was a lawyer?  I'm not

23   following --

24         MR. FRADIN:  Well, you're the one who raised

1    attorney/client privilege with this conversation.

2            MR. GRAY:  Because he says I don't know where

3    I've seen it before.  I talked to someone so I don't

4    know if it's a lawyer or not.  I'd like to establish

5    whether or not it's a lawyer before you go into it.

6            MR. FRADIN:  So would I.  Go ahead, establish

7    it.

8            MR. GRAY:  I don't know.  I have no idea.

9            THE WITNESS:  I don't know.  This thing was --

10   it's just nothing that --

11           MR. FRADIN:  What else was --

12           THE WITNESS:  -- there's nothing in here

13   that's significant enough that I remember.

14   BY MR. FRADIN:

15       Q    What I was going to show to you at that time?

16       A    I don't remember.  I mean this -- I remember

17   the other one because I think I was the one that went

18   and found the e-mails when somebody asked me about a

19   Chemical Safety Board conversation.  This one -- I don't

20   remember because it was just not significant.

21           COURT REPORTER:  It was just not what?

22           THE WITNESS:  It was just not significant.

23   There was no -- there was no follow-up and communication

24   whereas the other one -- I remember because somebody

1   asked me with the Chemical Safety Board make a request

2   at some time that we responded to and I said yeah, I'll

3   have that document somewhere and I found it  This one --

4   I just -- it wasn't anything that makes me remember.

5       Q    Okay.

6            COURT REPORTER:  Is that you asked him --

7            THE WITNESS:  What makes me remember.  That

8   makes me remember.  No activity --

9            MR. GRAY:  You don't have to answer.  He's the

10  court reporter.  He's just trying to get your -- what

11  your words -- you just said were correct.  He's not

12  asking you anything further.

13           THE WITNESS:  Nothing further makes me

14  remember.

15           MR. GRAY:  Why don't we take a break?

16           MR. FRADIN:  Sure.

17                        (Whereupon a short recess was

18                        had.

19  BY MR. FRADIN:

20      Q    Okay, G-13.  Can you identify that document?

21      A    It's the job description for the contract

22  safety coordinator.

23      Q    Is that the job description for -- what was

24  Dino's job?

1          A    It appears to be but it does not specifically

2    say on here Citgo Lemont refinery.

3          Q    I mean, this was provided by Citgo in this

4    litigation.

5               MR. GRAY:  So which one is this -- this is G-

6    13?  But you don't have a Bates number on it?

7               MR. FRADIN:  Maybe the Bates number got cut

8    off with printing.

9               MR. GRAY:  Okay, but this is the one that

10   you're representing was Bates number?

11              MR. FRADIN:  This is the one that was Bates

12   number --

13              MR. GRAY:  Okay, fine.  So, when we produce

14   documents, Jim --

15              THE WITNESS:  Uh-huh.

16              MR. GRAY:  -- it's -- you look at the next

17   page.  It says at the bottom, and that identifies that

18   your lawyers produced it to Dino's lawyers.  Okay?  It's

19   not here but Mr. Fradin's representing that it should be

20   on there but it somehow got cut off.

21              MR. FRADIN:  We can go off the record and I

22   can print it out --

23              MR. GRAY:  No, no, no.  I'm taking your

24   representation.  Let's keep the show going.

1  BY MR. FRADIN:

2      Q      Can you identify the document?

3      A      Yeah.  It's the job description for the

4  contractor safety coordinator.

5      Q      And in 2014, contract safety coordinator is

6  the position that Mr. Arias held, correct?

7      A      Correct.

8      Q      This document lists essential duties.  Do you

9  have any information that Mr. Arias was in any way

10  deficient in any of those job duties in 2014?

11      A      Not that I recall.

12      Q      If there is problems with an employee in their

13  performance is there any sort of method for identifying

14  that?

15          MR. GRAY:  Objection, form, foundation.

16          THE WITNESS:  On this document or in general?

17          MR. FRADIN:  In general.

18          THE WITNESS:  Several things you can do, I

19  mean, if it's an incident that occurs at a specific time

20  you'll have a counseling and/or related discipline to

21  the incident or event.  Also there's annual appraisals

22  of the individual's performance as well, at a minimum,

23  even if nothing occurred in between the annual time.

24

BY MR. FRADIN:

Q    Where are the annual appraisals kept?

A    There's an online system.

Q    Who would have access to that?

A    HR would have access to it.  An employee
themselves has access to their own document and then the
employee's direct supervisor has access to the
employee's documents as well or the online document.

Q    So as far as you know, there were no problems
with Dino in his performance of any of the seven
essential duties, correct?

        MR. GRAY:  Objection, form and foundation.

        THE WITNESS:  I did not specifically hear
anything directly related to those seven items.

BY MR. FRADIN:

Q    Are there any other job performance items that
are not listed on this document?

A    Well, everybody's got code of conduct issues
-- what they're -- how they're expected to conduct
themselves professionally both with other employees as
well as representatives of other companies, contractors.
We're all required to meet legal obligations, regulatory
obligations.  Those won't necessarily be identified in
here.  We had a lot of annual training related to those

1   responsibilities versus these are tend to be the more

2   technical functions of your job.  These are duties

3   versus conduct.

4       Q    Tell me about the difference between duties

5   and conduct.

6       A    The easiest way to say it for me would be

7   duties are the what you're expected to do and get done;

8   conduct is how you're expected to do those duties and

9   how you're expected to conduct yourself as an

10  individual.

11      Q    Which would you identify as performance?

12           MR. GRAY:  Objection, form.

13           COURT REPORTER:  Someone's at the door,

14  counsel.

15                          (Whereupon an interruption was

16                          had.)

17           THE WITNESS:  You'll have to repeat the

18  question.

19           MR. GRAY:  Did you give an answer?

20           THE WITNESS:  I don't even remember the

21  question.

22           MR. GRAY:  I think he said -- well, I'll let

23  him answer.

24

1   BY MR. FRADIN:

2       Q    All right.  Which duties or conduct is --

3   would you identify as performance?

4       A    Both.

5            MR. GRAY:  And I objected, form.  You can

6   answer.

7            THE WITNESS:  It would be both.  I mean, you'd

8   have a performance gauge on how you're doing versus the

9   what of your job that you're supposed to do but also

10  your performance appraisal relates to how you conduct

11  your business.

12  BY MR. FRADIN:

13      Q    Was there a performance appraisal of Dino in

14  2014?

15      A    I believe there was.  I don't know when he

16  resigned -- if he resigned in '15 there would have been

17  one for '14.  If he resigned -- they happen toward the

18  end of the year.  The final month of the year is usually

19  when they occur so I don't remember when he left but

20  there would be one for every year that he was still

21  employed at the end of the year.

22      Q    Is there a written document that is the result

23  of the performance appraisal?

24      A    There's an online document that the supervisor

1    and the employee populate.

2        Q    Is the job description master form used in

3    making that evaluation?

4        A    The document would not cross-reference every

5    item but it speaks to -- for the -- for the goals that

6    you set for that year, for the challenges you had that

7    year, what was your performance.  So it does not go down

8    and say in each of these categories how did you perform.

9    It's more for the course of this year you were in this

10   role, here's the plant activities that we had that you

11   had to deal with, here's how you conducted yourself

12   doing it and it's an assessment of that versus it

13   doesn't go, oh, you on item one here you scored this

14   way.  It doesn't -- it doesn't do that.

15       Q    Is the master form used for bonus evaluations?

16       A    The form itself is not the rating is.

17       Q    Explain to me how the rating is?

18            MR. GRAY:  Objection, foundation.

19            THE WITNESS:  There's a rating at the last

20   portion of your annual appraisal gives you a rating

21   which is a relative rating for how you perform versus a

22   criteria of top performers, next level performers,

23   average performers.  That contribution rating is one of

24   the multipliers when evaluation what level of bonus you

1   can get and also what range of bonus you can get.

2     Q   And are each of the central duties examined in

3   that evaluation?

4     MR. GRAY:  Objection, form, foundation.

5     THE WITNESS:  It would not -- as I said before

6   -- on the appraisal process does not directly cross-

7   check every one of these and try to rate you per each of

8   those categories.  It tries to rate your overall

9   performance for how you fulfilled your job duties as a

10   whole based on the activities that occurred during the

11   course of the year.

12   BY MR. FRADIN:

13     Q   By those job duties do you mean the essential

14   duties?

15     A   It would be your essential duties, also how

16   you conducted your business.  If you had additional

17   challenges that year there was something unexpectedly

18   that you were assigned to do because of need, how did

19   you respond to that.  You know, you were short-staffed

20   in an area and therefore you ended up having to fill two

21   job duties that would be taken into account into your

22   performance.

23     Q   Is the percentage of time that's in the far

24   right corner reflective in the bonus as well?

1      A    No.

2      Q    So there's no higher rate for the one that's

3 30 percent versus one that's 20 percent in terms of

4 evaluating somebody for the bonus?

5           MR. GRAY:  Objection, foundation.  You can

6 answer.

7           THE WITNESS:  I doesn't directly cross-check

8 like that.  Your overall performance contribution for

9 the course of the year is what is used to evaluate.

10 BY MR. FRADIN:

11     Q    Okay.  Did you receive a bonus in 2014?

12     A    Yes.

13     Q    Do you know what that amount of the bonus was?

14     A    No.

15     Q    Do you know approximately?

16     A    No, I would have to go find a document and

17 look at it.

18     Q    What's your salary?

19     A    Roughly $275,000.

20     Q    Do you know what it was in 2014?

21     A    Probably four, four-and-a-half percent a year

22 less, whatever that, whatever the math is.

23     Q    So maybe $240,000 or so?

24     A    Yeah, could be.  Whatever that works out going

1 backwards.

2     Q    Maybe you can somewhat -- can't do that kind

3 of math in my head but somewhere in the low $200,000,

4 would you say in 2014?

5     A    Or mid, low to mid.

6     Q    Low to mid-200's

7     COURT REPORTER:  What was your answer?

8     THE WITNESS:  Low to mid.

9 BY MR. FRADIN:

10     Q    Do you know what your bonus was in 2017?

11     A    No.

12     Q    Approximately?

13     A    I'm trying to do math in my head.  It's

14 probably in the neighborhood of $60,000.

15     Q    Who makes the ultimate final determination on

16 the bonus amount?

17     A    It's a sequential process.  So the direct

18 supervisor has the initial entry based on their

19 personnel and what their parameters for a top performer

20 can get a bonus in this percentage range.  You have to

21 stay within -- within those ranges.  Then the individual

22 supervisor would give his input to their division

23 manager who's looking to make sure that all the

24 department managers in their area did things in a

1   similar manner and they may tweak it a little bit.

2          Then there's also a discussion after that with

3   the refinery leadership team bringing all the divisions

4   together to make sure it looks like an equitable

5   distribution occurred.  So that ultimately the final

6   signature on that becomes the plant manager saying

7   here's what, in our case, Lemont refineries total bonus

8   plan looks like.

9          So the plant manager is the final signature

10  but along the way the individual's immediate supervisor

11  division manager and then the refinery division managers

12  as a whole will have gotten together to review.

13     Q    Who's the plant manager?

14     A    Jim Cristman.

15     Q    Who was the plant manager in 2014?

16     A    Jim Cristman.

17          COURT REPORTER:  Is it C-h-r-i-s-t-m-a-n.

18          THE WITNESS:  C-r -- yeah.  C-r-i-s-t-m-a-n.

19  BY MR. FRADIN:

20     Q    Have you received a bonus every year that you

21  worked for Citgo?

22     A    No.

23     Q    Which year did you not receive a bonus?

24     A    I don't remember but there -- there was at

1  least one year, possibly two, where the entire

2  corporation -- no one received a bonus.

3          COURT REPORTER:  Did not receive a bonus?

4          THE WITNESS:  No one, yeah.  That the entire

5  corporation --

6          COURT REPORTER:  Yeah, I heard that.  I heard

7  that.

8          THE WITNESS:  -- did not receive a bonus.

9  BY MR. FRADIN:

10     Q     Do you know within 2014 bonuses were given?

11     A     Yeah, bonuses were given in 2014.

12     Q     Do you know if they were given at all a rate

13  -- strike that.

14          When the direct supervisor discusses the

15  performance of the employee with the division manager is

16  that done verbally or in writing?

17     A     Usually verbally.

18     Q     And then from the division manager to the

19  department manager, is that also verbal?

20     A     Yeah.  What did you ask the first time --

21     Q     First was to the direct supervisor to the --

22     A     Okay.  That's the -- virtually the same thing.

23  In most cases the direct supervisor is a department

24  manager --

1      Q     Okay.

2      A     -- and then the department manager reports to

3  a division manager.

4      Q     And is that all -- that whole process is

5  verbal?

6      A     The discussion is generally verbal.  At the

7  end there is a spreadsheet of some sort that will

8  identify what the dollar amount for a bonus is but most

9  of the discussion happens verbally.  But at some point

10  it's got to be put into a spreadsheet so that it can be

11  communicated.

12      Q     And what's on that spreadsheet?

13      A     People's names and positions, what their

14  performance ranking was for the year, and then

15  ultimately their -- their bonus amount.

16      Q     Do you know if the 2014 bonus was particularly

17  different from any other year?

18      A     Not that I recall.  I think it was pretty

19  similar.

20      Q     Do you know if Dino received a bonus in 2014?

21      A     I don't think he received a bonus in 2014.

22      Q     Do you know why?

23      A     His performance.

24      Q     Okay.  Explain what you mean by that?

1    A    I believe he was an EDP-4 ranking, which is

2    somebody not meeting the expectations of their job and

3    for that you have a range that you can give in a bonus

4    and the low end of that range is zero.  Based on his

5    performance issues that year he received zero.

6    Q    Who made that determination?

7    A    That went all the way through the

8    organization, from Casey Bullock looking at it, me

9    looking at it, HR looking at it, the division managers,

10   and ultimately Jim Cristman would have seen it as well.

11   Q    Are you aware that Casey Bullock testified

12   that there were no performance issues in Dino's

13   performance in 2014?

14            MR. GRAY:  Objection, form.

15            THE WITNESS:  I don't know.  If 2014 was the

16   year that Dino had the disciplinary issues then there

17   were performance issues.  So I would be surprised if

18   somebody said there weren't.

19   BY MR. FRADIN:

20   Q    But you testified as well that out of the

21   seven essential duties there were no performance issues,

22   correct?

23            MR. GRAY:  Object.

24            THE WITNESS:  I wasn't aware of issues related

1 to these duties but these duties are only part of the

2 performance assessment.

3 BY MR. FRADIN:

4     Q    What's the -- is there a written document that

5 discusses the other duties that are part of the

6 performance assessment?

7         MR. GRAY:  Objection, form, foundation, asked

8 and answered.

9         THE WITNESS:  Yeah.  There's -- I -- there's

10 expectations for employees annual codes of conducts.  We

11 take annual training on that every year that says what

12 the expectation is for how you are to conduct your

13 business, how you're to treat other people, how you're

14 to be tolerant of people that are different.  Those are

15 all -- that's where that is all documented.

16 BY MR. FRADIN:

17     Q    So is it your testimony that Mr. Arias was not

18 eligible for a bonus in 2014?

19     A    He was eligible for a bonus in the range

20 commiserate with the rating he had and the bottom end of

21 that range was zero and that's what he got.

22     Q    Is there any sort of written documentation

23 between single employees that discusses this rating?

24     A    There is a published bonus plan that describes

1 how your employer contribution fits into the overall

2 calculation for the bonus.  I don't remember how

3 specific it is but there is a document that's right

4 under the Citgo website that explains that.

5     Q    I'm showing you what I have marked as Exhibit

6 I for identification.  Can you identify this document?

7     A    The first page or --

8     Q    The first page and then the document that

9 follows.

10     A    This is the compensation or just bonus.  Yeah,

11 this appears to be the summary of the -- it's called the

12 performance incentive plan but the bonus plan from the

13 Citgo website.

14     Q    Can you identify where the different sheets

15 between duties and conduct?

16     A    It does not that I can see.  It does not

17 differentiate that I can see.

18     Q    This is a true and accurate copy of the 2014

19 performance incentive plan for salaried employees?

20     A    It appears to be.

21     Q    And this is the plan that would be applicable

22 to Mr. Arias for 2014?

23     A    Yes.

24     Q    Can you identify within this document what

1    provision there is for not providing a bonus under the

2    circumstances that you described?

3         MR. GRAY:  For the record, you didn't give me

4    a copy again but this has --

5         MR. FRADIN:  I handed you the copy.

6         MR. GRAY:  That's for the witness.  How can he

7    -- it's a 35-page document.

8         THE WITNESS:  Yeah.  It would be pages 23 at

9    the bottom and page 24 at the top identifies how the

10   calculation for each individual's incentive award is

11   modified by the factor associated with their individual

12   performance during the plan year.  And that carries from

13   the bottom of page 23 to the top of page 24 where it

14   actually has a table that shows if your EDP rating was a

15   one then your bonus modifier can be between 120 and 130

16   percent.  If it's an EDP-4, it could be between zero

17   percent and 40 percent.  And then it goes on to show the

18   formula.

19   BY MR. FRADIN:

20        Q    You testified earlier that in terms of the job

21   duties in the job description match the form there were

22   no complaints about Mr. Arias in 2014, correct?

23        MR. GRAY:  Objection, form.

24        THE WITNESS:  I did not recall any

1 conversations about the specific seven job duties shown

2 in the job description.

3 BY MR. FRADIN:

4     Q    Yet, it's your testimony that he received a

5 zero rating for performance, is that correct?

6     A    Yes.

7     Q    Don't you see where that would conflict with

8 the -- having no complaints regarding his job duties?

9     A    No.

10     MR. GRAY:  Objection.

11     THE WITNESS:  No, I don't see that because I

12 explained before that the job duties are the what you

13 do, the expectations of behavior are the how you do

14 them, and his behavior was obviously bad enough to have

15 his overall ranking drop to an EDP-4 level, which allows

16 you to get zero to 40 percent, which is what happened.

17 BY MR. FRADIN:

18     Q    Now, EDP-4 rating, it is 40 percent.  You see

19 that?

20     A    No, on page 24 it's individual performance

21 modifier.  The range is zero to 40 percent.

22     Q    Why is it 40 percent on page 23?

23     A    That's how the incentive pool is determined,

24 which means to give a department an amount of money to

1   distribute among their employees they will take their

2   distribution and say, if you have two EDP-1's -- that

3   allowed -- now the amount of money you have is equal to

4   130 percent of those -- that bonus.  That bonus piece of

5   the pie.  If you have an EDP-3 they allow you to

6   multiply to say -- if you just did a whatever -- easy

7   way to do it, mid-range of each employee, here's the

8   amount of money you have to distribute.  They have to do

9   something so they know how much money to give you but

10  then you could distribute it accordingly as long as you

11  stay within the ranges.

12          Whereas if you had two employees very close to

13  each other but one wound up an EDP-1 and one was a 2,

14  and you wanted them to get very similar bonuses you

15  could -- because you had a bonus pool of money say I'm

16  giving this guy the top range in the EDP-2 at a 125

17  percent and I'm only going to give the EDP-1 125 percent

18  because they were very, very close and it was splitting

19  hairs on how I ranked them.  So therefore I'm using the

20  money accordingly.

21          So this is strictly -- to define -- decide how

22  much money is given to each department.  Where this is

23  for you to stay within a range to say based on their

24  rating this is what you can give somebody.

1     Q    So the 40 percent that was allocated for Dino

2  was given to somebody else?

3          MR. GRAY:  Objection, form.

4          THE WITNESS:  It was not allocated to Dino.

5  It was allocated in the calculation for part of the pool

6  -- it's not allocated -- it's not allocated until you

7  allocate it.

8  BY MR. FRADIN:

9     Q    So who gave him the EDP rating of 4?

10         MR. GRAY:  Objection, asked and answered.

11         THE WITNESS:  Casey.

12  BY MR. FRADIN:

13     Q    Casey gave him a rating of 4?

14     A    Yep.

15     Q    And so under Section 7, that would mean that

16  the incentive pool, individual performance modifier  is

17  40 percent, correct?

18     A    That would -- yeah -- that would mean that the

19  -- there would have been that much money available in

20  Casey's department pool.

21     Q    For Dino, correct?

22     A    No, for distribution among his whole

23  department.  They just need to have a way to decide how

24  much money you have to distribute so that's the way they

1  do it.

2       Q    Well --

3       A    But the pool is not distributed until Casey

4  first looks at it, I look at, the division managers look

5  at it, and the plant manager looks at it.

6       Q    So let me step back.  The 40 percent based on

7  EDP rating of 4, that's with respect to Dino, correct?

8            MR. GRAY:  Objection, form, foundation.

9  Misstates the testimony.

10           THE WITNESS:  Yeah.

11           MR. FRADIN:  So --

12           MR. GRAY:  Wait, you need to answer the

13  question.

14           THE WITNESS:  If Dino was the only EDP-4 that

15  Casey had that year then a 40 percent multiplier would

16  have been based on Dino's salary that's correct.

17  BY MR. FRADIN:

18       Q    Was there another EDP-4 that year?

19       A    I am not sure.  I don't think so but there's

20  been other EDP-4's.

21       Q    So, just so I understand the difference

22  between Section 7 and Section 8.  You're saying that the

23  40 percent is available for individuals with a EDP

24  rating of 4 and then after that there's a second step

1  where the -- that 40 percent can be distributed or it

2  can't be distributed?

3      A    They -- they have to have a means to decide

4  how much money is going to be made available based on

5  the ratings so that you can distribute it.  If they only

6  went by a mid-range number or whatever you would almost,

7  by the math, be forced to say everybody is only going to

8  get this.  So this is the means they use to determine

9  what pool of money.  That's why it's called a pool.

10     Q    But if there's nobody else with an EDP rating

11 of 4 then what happened to that 40 percent that was

12 allocated?

13     A    It would have got allocated to somebody.

14     Q    To who?

15     A    I don't know -- somebody -- Casey would

16 allocate some, I would allocate some, because I have --

17 Casey has a pool that is a subset of my overall pool

18 so --

19     Q    So even the EDP rating of 4, that 40 percent

20 -- that was allocated to people other than Dino?

21     A    Correct.

22     Q    But the initial allocation of the EDP rating

23 of 4, excuse me, the only person who was allocated or

24 identified as EDP rating 4, that 40 percent initially

1   was allocated for Dino, correct?

2      A   No.  It was used in the math to determine the

3   pool.  It's not allocated to anybody.  It's simply a

4   math exercise for them to say you have 15 people in your

5   department, three are EDP-1's, so many are EDP-2's,

6   therefore, we do this calculation and you have this much

7   money to distribute.  And then you can distribute that

8   as long as you stay within these ranges on the top of

9   page 24.  But it's not allocated -- they just simply

10  tell you -- here's the amount of money you have for your

11  overall department.

12     Q   It says here that each manager will be

13  informed of the total amount of the incentive pool for

14  the groups within his or her area of responsibility,

15  correct?  You see that on page 23?

16     A   Correct.

17     Q   So if nobody else is within that group of EDP

18  rating 4, why didn't Dino get that money?

19         MR. GRAY:  Objection, form.

20         THE WITNESS:  It's because his performance

21  warranted no bonus.

22  BY MR. FRADIN:

23     Q   But even within this incentive bonus program

24  he was given a rating that warranted a 40 percent bonus,

1 correct?

2      A      No, that warranted anywhere from zero to 40

3 percent.

4      Q      And that's the EDP rating that Casey you said

5 gave him, right?  The EDP rating of 4?

6      A      Yes.

7      Q      And then Casey was then given the direction of

8 what to do with that money?

9            MR. GRAY:  Objection, from.

10            THE WITNESS:  As I explained before, Casey

11 gets the first input.  Then I will see all the input and

12 get to decide if I'm okay with it or if I want to

13 allocate funds differently.  Then that will go and be

14 discussed with other division managers as well before

15 the final plan is made but Casey does get the first

16 opportunity to look.  I did not disagree with his zero

17 rating.

18 BY MR. FRADIN:

19      Q      Do you have documentation indicating where

20 that payment was made to?

21            MR. GRAY:  Objection, form.

22            THE WITNESS:  There was nothing that would

23 break up that 40 percent.  There would be a pool of

24 money for all of Casey's department and all of my

1 division and there would be a document that shows who
2 got what money but there's nothing that says there was a
3 40 percent share broken up and given to somebody else.
4 It will simply say employee A received this amount,
5 which is this percent.  Employee B received this.
6 There's nothing that says I broke up a certain fraction
7 of the pool to give.  It just says I spent the pool.
8 BY MR. FRADIN:
9     Q    This 40 percent is identified as an incentive
10 pool individual performance modifier, right?
11     A    Yes.  It's -- because that's how they do the
12 calc based on when they have the EDP ratings for your
13 group the individual performance modifier is what they
14 use to do the calc for the pool of money that they give
15 you.
16     Q    How do you know that Dino had an EDP rating of
17 4?
18     A    Because I'll get that information from Casey
19 when were' doing the EDP's.  I'll get it -- I also have
20 access to be able to look at the EDP ratings and sign
21 off on them as they're being completed when the people
22 are doing the performance reviews.
23     Q    When's the last time you looked at it?
24     A    In 2014, it would have been right around the

1    time they're due, which is toward the end of the year.

2         Q    But you remember that it was 4, correct?

3         A    Yes.

4         Q    Did you get that in writing from Casey?

5         A    It will be in the system.  The system says

6    what everybody's individual rating is.

7         Q    Is that a document that you search for in --

8    when we made the document request here?

9         A    I didn't.  HR -- HR has access to all that so

10   my guess is they did but I don't --

11        Q    Who in HR has access to that?

12        A    You'll have to ask Dick -- or somebody -- I

13   don't know who all does.  Not many people but --

14        Q    But there's no written documentation that then

15   shows how that 40 percent is ultimately distributed?

16        A    No.  There would just be a final distribution

17   of which each individual got and a spreadsheet that

18   shows that you stayed within this range.  The spread,

19   you know, if you have somebody that was an EDP-1, you

20   gave them a certain amount of dollars.  It will how that

21   you kept it within the 120 to 130 percent range.

22   Otherwise, there would have been questions to say you're

23   not allowed to go outside of this range -- why is this.

24        Q    Is there documentation that shows what the

1    supervisor uses to determine the EDP rating?

2         A    The EDP itself has comments and there's some

3    parts that are open -- open lines for free comments to

4    put in and then there's also some parts where there is

5    pre-formatted, you know, how did this person perform in

6    this specific area.  But there -- there's an EDP

7    document that -- that says, you know, sit down with the

8    employee and you walk -- walk through the EDP document

9    and say your final rating was this and both verbally

10   tell them why and also try to document it and probably

11   tell them more verbally than trying to document every

12   word but there's a document.

13        Q    What's listed in the EDP document?

14        A    I don't know.  I don't remember specifically

15   what's listed in the 2014 EDP document.

16        Q    Where would the 2014 --

17        A    One of the things listed at the end is what

18   their overall rating was.

19        Q    Do you remember any of the categories inside

20   the EDP document?

21        A    There's goals completion or how did a person

22   perform versus their goals.  There's a section called

23   competencies, which speaks to, you know, how well the

24   individual communicated with other people and aspects of

1    their jobs.  You know, are they a self-starter -- are

2    they -- I can't remember all the things -- but it's --

3    it's -- the section is called competencies.

4        Q    Does it look a lot like the essential duties

5    section of this master job form?

6        A    No, since it tries to assess your overall

7    performance both on what work you do and how you do it.

8     It's not a copy of that.  It doesn't look similar to

9    that at all.

10       Q    Do you know why this form hasn't been

11   disclosed yet in this litigation?

12            MR. GRAY:  Objection, foundation.

13   BY MR. FRADIN:

14       Q    Do you have a copy of the form?

15       A    No.

16       Q    When it comes time to fill out the form where

17   do you get it from?

18       A    It's online.  It's an online system.

19       Q    Online with Citgo employees having access to

20   it only?

21       A    Yeah.  It's, I mean, as I think I said before

22   the individual has access because they populate sort of

23   a -- at the beginning of the year they put in goals,

24   they'll put in personal goals, personal development

1   goals.  They will make a self-assessment at the end of

2   the year so they have access.  Then their immediate

3   supervisor has access because they're the ones

4   documenting their produced performance at the end of the

5   year.

6        Q    Is it the same for everybody other than the

7   parts that are filled out --

8        A    The document is -- the document is the same.

9   It's the same form.

10       Q    And it's filled out at the beginning of every

11  year?

12       A    There's different times of the year where

13  different things are put in.  There's -- the goals and

14  objectives are toward the beginning of the year.  The

15  overall assessment of how they performed is toward the

16  end of the year because it's your -- the assessment of

17  your annual performance.

18       Q    Do you know what Dino's goals and objectives

19  were for 2014?

20       A    No.

21       Q    Have you looked at the 2014 EDP form for Dino?

22       A    Not in 30 years or four years or how ever long

23  its been since --

24            COURT REPORTER:  I can't hear you.  I'm sorry.

1          THE WITNESS:  Not since that year.

2    BY MR. FRADIN:

3          Q     When do you do the EDP ratings?

4          A     It's toward the end of the year since it's for

5    annual performance for that year.

6          Q     So who would have filled out the 2014 EDP form

7    for Dino?

8          A     Casey and Dino.  Dino makes his self-

9    assessment as well.

10         Q     That's at the beginning of the year, right?

11         A     At the end of the year you also have a section

12   of the form where you can assess yourself.

13         Q     What about when an employee no longer works

14   for the company but did work for the company earlier in

15   the year?

16         A     Then it just depends on, you know, if they

17   were there when the assessment was done they completed

18   it.  If not -- if you're not in plant you can't complete

19   it.

20         Q     Then who completes it then?

21         A     That portion would be blank.

22         Q     So there's never the second portion of the EDP

23   form completed?

24         A     It -- because the self-assessment portion

1  would not be completed.

2      Q    Would their portions be completed?

3      A    The supervisor's portion would probably be

4  completed.

5      Q    So who would have completed that form in 2014?

6      A    Casey.

7      Q    And what would he have done with the form?

8      A    He would -- it's an in-system form so it would

9  just -- he would just complete it and close it out or

10  approve it.

11          COURT REPORTER:  What?

12          THE WITNESS:  He would complete it and just --

13  you close it out or designate it as complete in the

14  system and --

15      Q    But you do remember seeing the form for Dino

16  for 2014?

17      A    I think I -- I either saw a form or I saw the

18  EDP rating.

19      Q    How would you see the EDP rating outside of

20  the form?

21      A    The rating -- when we're doing the ratings at

22  the end of the year, after we discuss them, the

23  individual's rating are all entered into a spreadsheet

24  so that you can accumulate the spreadsheet with

1  everybody else in the facility so that there's one

2  master spreadsheet in the end that can be delivered to

3  corporate to say for our location here's the EDP ratings

4  of all employees.

5       Q    So going back to Section 7, when it says each

6  manager will be informed of the total amount of the

7  exemptive pool for the groups within his or her area of

8  responsibility.  What do you define as the group within

9  his or her area of responsibility?

10      A    Let me read this.  Okay, for Casey, for

11  example, he has safety and health.  So it's essentially

12  all of this direct reports.  So he has the medical

13  department, a nurse in the medical department.  He has a

14  industrial hygienist and a department lead for the

15  industrial hygienist for area safety coordinators, a PSM

16  coordinator, a contract safety coordinator.  All those

17  people would make up his group and therefore his pool of

18  money would be based on their EDP ratings.

19      Q    Okay.  So somebody within that group received

20  that 40 percent that was initially allocated based on

21  the EDP rating of 4 for Dino?

22           MR. GRAY:  Objection, form, foundation.  Asked

23  and answered.  Misstates the testimony.

24           THE WITNESS:  It was not allocated for Dino.

1    It was allocated for somebody in that group or somebody

2    anywhere else in the refinery.  I don't know exactly how

3    the distribution ended up because sometimes you can't

4    distribute the money or you run out of distribution

5    before you run out of money and therefore that money is

6    available to distribute another departments.

7    BY MR. FRADIN:

8        Q    Now, in Section 8-B, discusses that the

9    president and chief executive officers of Citgo will

10   approve the individual performance modifiers to be

11   applied in the incentive award calculations for all

12   reporting officers in -- presume it's above Salary Band

13   5.  What is Salary Band 5?

14             MR. GRAY:  Just to reflect, he's having

15   trouble finding where you're reading from.  Can you say

16   the page, is that --

17             MR. FRADIN:  Yes, page 24.

18             THE WITNESS:  Above five, that would be the

19   plant managers and above.

20   BY MR. FRADIN:

21       Q    Where are the salary bands identified?

22       A    I don't know -- not in this document.  This

23   document just refers if you are salary band something or

24   HR would know if there's a list somewhere that

1   identifies salary bands different positions are.

2          COURT REPORTER:  Is that b-a-n-d, band?

3          THE WITNESS:  Band, yeah, b-a-n-d.

4   BY MR. FRADIN:

5     Q    Was Dino Salary Band 5 or above in 2014?

6     A    No.

7     Q    Okay.  All right.  Take a look at what's

8   identified as Exhibit H for identification.

9          MR. GRAY:  I should keep a copy of --

10          MR. FRADIN:  We'll do that after the next

11   deposition.

12          MR. GRAY:  I'll keep it for the next one.  I

13   won't give it away.

14          MR. FRADIN:  Well -- and actually you don't

15   get copy of the exhibits generally.  That's not

16   something that's typical that you take the exhibits with

17   you.  That's not --

18          MR. GRAY:  Well, not the original exhibits.

19          MR. FRADIN:  Well -- well -- I need to get

20   them back and then we'll deal with it after the next

21   exhibit -- next deposition -- but right now -- so I

22   don't have to print them out again -- next deposition.

23          MR. GRAY:  Well, you're handling the next

24   deposition.

1      MR. FRADIN:  I'm keeping a hold of them until

2 then.

3      MR. GRAY:  This would be the first deposition

4 in my 30 years.  So you're giving exhibits to the

5 witness and you're refusing to give them to me.

6      MR. FRADIN:  I'm giving them to you.  You can

7 look at them but once you're done you give them back to

8 me, yeah.

9      MR. GRAY:  Okay, that's not the way of the

10 next deposition?

11      MR. FRADIN:  So we can use them in the next

12 deposition.  Unless you want to take an hour and we'll

13 print them out again but in order to have this --

14      MR. GRAY:  You're giving me and the witness --

15 you're giving him group exhibits of 50 pages each in a

16 blatant attempt to confuse people, okay.

17      MR. FRADIN:  That's not intended --

18      MR. GRAY:  Look -- you give him 50 pages --

19 you won't let me look at it so the record's clear.

20      MR. FRADIN:  I've giving them to you.

21      MR. GRAY:  No -- just so we're clear.  Okay?

22 Are you -- let's make sure the record's correct here.

23 Are you giving a copy to me, the lawyer, and to the

24 witness?

1          MR. FRADIN:  I'm giving you one copy for both
2   you guys to take a look at.  If you want to look at
3   another copy -- you can look at the other copy but I
4   would like them back for the next deposition.
5          MR. GRAY:  But the record's unclear as to what
6   you're giving the witnesses.  You've grouped together
7   non-sequential documents, not let the witness look at
8   them in full, and you're not letting me look at them.
9          MR. FRADIN:  You're now free to look at them
10  right now.
11         MR. GRAY:  But -- okay -- you just took my
12  copy from me.  You physically just took my copy from me.
13         MR. FRADIN:  That wasn't the document that we
14  were just looking at for the last --
15         MR. GRAY:  You reached over to my pile and
16  took my copy from me.  Can we get this on the record,
17  okay?  You just took my copy -- like in some physical
18  show of aggression you're taking my document.
19         MR. FRADIN:  Physical show of aggression?
20         MR. GRAY:  Yeah, that was my copy.  What am I
21  -- what am I now going to get in a fight to take the
22  document back?  That's not the way it works.
23         MR. FRADIN:  These are the exhibits for the
24  deposition.  They're going to go to the court reporter.

1   You'll get a copy of them in the transcript.

2         MR. GRAY:  This is already a mess.  You have a

3   -- you have no record of this.  You have grouped

4   together things in an attempt to try to get testimony

5   that is inaccurate and now -- and the first time in my

6   career you won't let me see a copy.  I don't understand.

7   And then you give me a copy -- you gave me a copy --

8         MR. FRADIN:  Now you're delaying -- you're

9   just trying to delay so that we don't have time to do

10  the next deposition is what you're trying to do.

11        MR. GRAY:  I mean, that is so foolish.  I

12  don't know how to respond to that.  Okay, I will take a

13  look at this and make sure that it's fair.  But much

14  like the last one, they're cobbled together ones and you

15  don't want me to look at it.

16        MR. FRADIN:  You look at it.  You're looking

17  at it right now.  You're trying to be difficult.  You're

18  trying to create a record that's false.  That's all

19  you're trying to do.  I appreciate that you're an

20  experienced --

21        MR. GRAY:  Wait, so that's in your normal --

22  in your normal depositions you don't give a copy to

23  opposing counsel?

24        MR. FRADIN:  I do.  You're looking at it in

1   your hands right now.

2          MR. GRAY:  No, no, no.  Now the witness isn't

3   able to look at it at the same time.  So you're making

4   us looking at the sequentially --

5          MR. FRADIN:  Will you give it back to me when

6   I'm done so that we can use it for the second

7   deposition?

8          MR. GRAY:  Why do I have to give it back to

9   you to use it for the second deposition.  Why can't I

10  look at it and continue to look at it between now and

11  the deposition.  These are huge documents.

12         MR. FRADIN:  Because that's not how

13  depositions work.  It's my deposition.  I get to show

14  documents to witnesses as I show it to them.  It's not

15  for you to show it to your witness in between

16  depositions.  That's not appropriate.

17         MR. GRAY:  I didn't say I was showing anything

18  to a witness.

19         MR. FRADIN:  That's what your intention is to

20  do, sure.  You're witnesses are clearly very well

21  coached.  And I have an opportunity to take a second

22  deposition to use the same exhibits without you coaching

23  them in between.

24         MR. GRAY:  Listen, your next exhibit has

1   cobbled together -- you called it H-1 but H-15, H-36 is

2   in here.  H-23 is in here.  I mean, you're making your

3   deposition a joke.  You're making it a joke.  We'll deal

4   with it with the Judge later.

5           You've said this is H-1.  What you've just

6   gave him is -- now that I'm able to look at what you

7   gave the witness isn't H-1.  It's a bunch of other stuff

8   that you've cobbled together and you won't let him look

9   through it.  It's ridiculous.

10          MR. FRADIN:  He's looking at it right now.

11          MR. GRAY:  It's ridiculous.

12          MR. FRADIN:  Take a look at what's marked as

13  H-1 and then --

14          MR. GRAY:  It's not marked as H-1, Mr. Fradin.

15  I want to make sure this is correct.  You've got --

16  let's be clear.  You've got H-1 in here.  You've given

17  him H-6.

18          MR. FRADIN:  All right, well, we'll take out

19  H-6 for now.

20          MR. GRAY:  You've given him H-23.  You've

21  given him H-15.  You've given him H-37.

22          MR. FRADIN:  Now that's -- H-1, which is --

23          MR. GRAY:  Okay.  So now you're saying do not

24  look at the rest of the documents he's given you.  He's

1  directing you to only look at H-1.

2          THE WITNESS:  Okay, I've looked at it.

3          MR. GRAY:  He's only looking at --

4  BY MR. FRADIN:

5      Q    Can you identify it?

6      A    This is a safety complaint letter dated May

7  13th, 2013, that an employee of Citgo sent to OSHA.

8      Q    Have you seen this document before?

9      A    Yes.

10     Q    Is this related to the OSHA hearing that you

11 discussed earlier?

12     A    No.

13     Q    Okay.  The OSHA hearing was also in 2013,

14 correct?

15     A    The -- I'm not sure if the hearing was but the

16 investigation that they did that later resulted in a

17 hearing occurred in 2013.

18     Q    Do you know why nothing for the other hearing

19 or investigation was provided by Citgo in this

20 litigation?

21     A    No.

22     Q    Do you have an independent recollection of

23 this complaint?

24     A    Do you have the -- that's so broad -- do you

1  have a precise question what --

2     Q    Do you -- other than me showing you this

3  document right now, do you recall this complaint having

4  been made?

5     A    Yes.

6     Q    Do you recall the outcome of the complaint?

7     A    Yeah.  In the end OSHA did not have a finding.

8  We signed an informal agreement with them related to the

9  one aspect of the complaint that they were really

10  focused on was the coke drums.  So we had an informal

11  agreement that we signed with them to get an additional

12  third-party to look at work that was done by Citgo and

13  make a determination if we needed to change any of our

14  inspection plans.  That was the final outcome.

15     Q    Do you know who made this complaint initially?

16     A    Yes.

17     Q    Who?

18     A    A guy named Dave Handkins.

19     Q    How do you know that?

20     A    Because OSHA left his name on a document that

21  our PSM coordinator observed during some of the meetings

22  with OSHA.

23     Q    Does Dave Handkins work for Citgo now?

24     A    No.

1    Q    What happened to Dave Handkins?

2    A    I believe he was terminated.

3    Q    What was the reason given for Dave Handkins

4  termination?

5         MR. GRAY:  Objection, foundation.

6         THE WITNESS:  I need to answer though,

7  correct?

8         MR. GRAY:  If you know, yeah.

9         THE WITNESS:  I'm not sure it's the only

10 reason but I know it was related to lying in an

11 investigation -- a safety investigation in an incident

12 that he was involved in.

13 BY MR. FRADIN:

14   Q    What was the nature of the safety

15 investigation?

16   A    I don't remember graphic details but it had to

17 do with inappropriate permitting an authorization for

18 work in an area that he was the responsible operator

19 for.

20   Q    What was Dave Handkins position?

21   A    He was a chief operator.  It's on our north

22 plant area of the facility.

23         COURT REPORTER:  Can you speak a little

24 louder.  Thank you.

1          THE WITNESS:  It was in our north plant area.

2    BY MR. FRADIN:

3          Q    Do you know how to spell -- how do you spell

4    Handkins.

5          A    I'm not sure.  A shot, it might be Handkins,

6    H-a-n-d-k-i-n-s.  I'm not sure.

7          Q    Do you know where Dave works now?

8          A    No.

9          Q    Do you know where Dave lives?

10         A    No.

11         Q    How old is Dave?

12         A    I don't know.  I'd be guessing.

13         Q    Well, guess.

14         A    Fifty-ish.

15         Q    So in 2013, OSHA was investigating Dave

16   Handkins' complaint, correct?

17         A    Correct.

18         Q    But they were also investigating a additional

19   complaint, correct?

20         A    Not an additional complaint that I know of.

21         Q    The hearing that you went to in or around

22   2013, who initiated that complaint?

23         A    There wasn't a complaint.  There was a fire

24   incident so they came in on their own.

1     Q    Are you aware that Casey Bullock told Dino not

2 to talk with OSHA when they were on the premises?

3         MR. GRAY:  Objection, form, foundation.

4 Misstates the evidence.

5         THE WITNESS:  Nope, I'm not aware of any such

6 direction.

7 BY MR. FRADIN:

8     Q    Did Casey ever talk to you about OSHA being on

9 the facility's premise?

10    A    Related to --

11    Q    Related to either the hearing that you

12 referred to earlier or the complaint?

13    A    Yes.

14    Q    What was the nature of those conversations?

15    A    Well, when OSHA comes in, I am generally very

16 closely involved.  Casey would be closely involved

17 because he's the Manager of Health and Safety and Ray

18 Boutte so anytime OSHA would be in, we would all three

19 be heavily involved in discussing status and what OSHA's

20 information requests were -- what we've given them so

21 far.  Conversations when OSHA was going to be or when

22 they planning on leaving and coming back.  I would even

23 be in some of the meetings with OSHA, so --

24    Q    Well, were you aware that Dino asked Casey

1   Bullock to speak -- strike that.

2           Were you aware that Dino asked Casey Bullock

3   if he could go to discuss with Roger Evans in person

4   regarding safety violations at Citgo?

5           MR. GRAY:  Objection, form, foundation.

6   Misstates the evidence.

7           THE WITNESS:  I don't think Roger Evans --

8           COURT REPORTER:  Pardon?

9           THE WITNESS:  I don't think that Roger Evans

10  works for OSHA.  Aren't we talking about OSHA?

11      Q   We're talking about the Chemical Safety Board

12  at this point.

13          MR. GRAY:  Same objections if the question is

14  still pending.

15          THE WITNESS:  I'm not aware that there was any

16  discussion or request to go speak to Roger Evans.

17  BY MR. FRADIN:

18      Q   Would you expect -- if there was such a

19  request that Casey Bullock would bring that to you?

20      A   Oh, yeah.

21      Q   Why?

22      A   Because somebody needs a requesting to go

23  speak to an outside agency.  I would know that all the

24  time.  I would be expected to know that.

1      Q     Are you aware of the leaks in the FCC unit in

2  around 2012 to 2015?

3      A     Yes.

4      Q     What was the nature of those leaks?

5      A     There -- I'm not sure of all the leaks but I

6  know there were leaks on the FCC reactor head that

7  required several repairs during that timeframe.

8      Q     Are you aware if Roger Evans wanted to

9  investigate those leaks?

10     A     No.

11     Q     Are you aware of OSHA wanting to investigate

12 those leaks?

13     A     One of the items in OSHA's complaint that they

14 investigated related to the FCC.

15     Q     What's the danger of the leaking FCC had?

16     A     There's no danger as long as you shut down and

17 do the maintenance.  Danger, I mean, all leaks require

18 you to be, you know, approach them safely.  Make a

19 determination whether they can be addressed without

20 shutting down a unit or not.  And if you have to shut

21 down a unit then you shut down the unit per your

22 established procedures, isolate and make the repairs,

23 and when the repairs are inspected and satisfactory, you

24 come up.

1    Q    Would it be against public policy for Citgo

2  supervisors to tell their employees not to talk with

3  OSHA?

4         MR. GRAY:  Objection, form, foundation.

5         THE WITNESS:  Yeah, everyone has the right to

6  talk to OSHA.

7  BY MR. FRADIN:

8    Q    So you agree that if Casey Bullock were to

9  tell Dino not to speak with OSHA while they're there

10 that would violate public policy?

11   A    It seems like speculation but I think nobody

12 -- everyone has a right to speak to OSHA.  Nobody is

13 ever restricted in the -- I don't know how you can

14 restrict them.

15   Q    If he were to tell him that he would be fired

16 if he spoke to OSHA would that be a restriction that you

17 would endorse?

18   A    No.

19   Q    Why?

20   A    Because everybody has the right to speak to

21 OSHA.

22   Q    Did you ever tell Casey Bullock to tell

23 employees not to speak with OSHA?

24   A    No.

1    Q    Did you ever tell Casey Bullock any sort of

2  directions to give the employees when OSHA was

3  investigating?

4    A    No.  I mean, if OSHA -- when OSHA comes in,

5  like on this, they will tell us who they want to talk

6  to.  We will make sure we get the meetings organized and

7  get the employees to them and one of the instructions is

8  always given is -- they ask you question give them --

9  give them the answers.

10        They make a request for information, you know,

11 most of the -- they'll talk to operators.  They'll talk

12 to craftsmen and we always make sure that they get

13 access to whoever they want access to.  They always ask

14 for a union rep in addition.  When they first come in

15 they explain what they're there for.  They'll ask for

16 one of the members of the -- one of the elected members

17 of the Union's Workmens' Committee.  We make sure they

18 get access to that individual.

19    Q    What about the Chemical Safety Board.  Do you

20 make sure they have access as well?

21    A    The -- to my knowledge the Chemical Safety

22 Board -- they're like a different entity.  They've never

23 come in to ask for talking to anybody or -- they come

24 into facilities if there's an event that they're

1    investigating.  They don't come in like OSHA to do spot

2    audits or follow-up on complaints.  That's not their

3    responsibility.  Their responsibility, to my

4    understanding, is to follow-up on incident

5    investigations and investigate due cause analysis and

6    publish their findings.  But they're not -- they're not

7    like OSHA.  They're repeating where they're the

8    regulating body.

9         Q    Then what are they if they're not a regulating

10    body?

11         A    They are an appointed group and to my

12    knowledge they basically investigate when there's a

13    significant incident that happened somewhere they go in

14    and investigate and do root cause analysis and then

15    publish and communicate their findings.

16         Q    But you agree that they're a government

17    agency, correct?

18         A    Yes.

19         Q    Okay.  And you agree that they're a government

20    agency that is involved with safety and public policy,

21    correct?

22         A    I don't know public policy.  I know they

23    investigate incidents.

24         Q    Okay.  And do you know that Roger Evans was

1    requesting information from Citgo in 2013, correct?

2        A    That one document showed that they asked for

3    specific information on two events in Citgo and we

4    provided it.

5        Q    So what did you provide in response?

6        A    There were two -- boy -- if I had that

7    document I could tell you better but there were two

8    events they asked for information on.

9             One event was the vacuum area fire that

10   happened in late October and we provided them the root

11   cause failure analysis investigation report to that

12   incident, which had already previously been provided to

13   OSHA and Illinois EPA.

14            They had asked for a second incident which

15   turned out to just be a flaring event so we communicated

16   back to them that there's not -- this is a flaring event

17   and we weren't going to provide any information because

18   it wasn't an incident of the type that they were looking

19   for.

20       Q    But to your recollection you didn't provide

21   anything in response to their -- to Dino and Roger's

22   request for providing information regarding the 1984

23   fire, correct?

24       A    Yeah.  That thing they asked about Unical I

1  didn't provide it.

2          COURT REPORTER:  Say what?

3          THE WITNESS:  The thing they asked about

4  Unical -- I -- we didn't provide anything in it.  And

5  that one -- that one was the request that came through

6  an e-mail to Dino.  But they have nothing -- nothing to

7  my knowledge got provided on that and nor did they ever

8  ask again.

9          MR. FRADIN:  I don't have any additional

10  questions.

11          MR. GRAY:  I don't have any questions.  So

12  we're off the record.

13          COURT REPORTER:  Signature reserved?

14          MR. GRAY:  Yes, signature reserved.

15                      (Witness excused.)

16      (AND FURTHER DEPONENT SAITH NOT.)

17

18

19

20

21

22

23

24

1   STATE OF ILLINOIS    )

2                        )  SS.

3   COUNTY OF COOK       )

4

5       I, HOWARD N. REISMAN, a Certified Shorthand

6   Reporter of the State of Illinois, CSR License No. 084-

7   000411, do hereby certify that heretofore, to-wit, on

8   July 26, 2018, JAMES TANCREDI, personally appeared

9   before me at 8401 Crawford Avenue, Suite 104, Skokie,

10  Illinois;

11      That previous to the commencement of the

12  examination of the witness, the witness was duly sworn

13  to testify the whole truth concerning the matters

14  herein;

15      That the foregoing deposition transcript was

16  stenographically reported by me and was thereafter

17  reduced to writing by means of shorthand and afterwards

18  transcribed under my personal direction and that this

19  constitutes a true and accurate record of the testimony

20  given and the proceedings held at the aforesaid date,

21  time, and place;

22

23

24

1        That I am not a relative or attorney or counsel for

2   any of the parties herein, nor a relative or employee of

3   such attorney or counsel for any of the parties herein,

4   nor am I interested, directly or indirectly, in the

5   outcome of this action.

6            IN WITNESS WHEREOF, I do set my hand and affix

7   my seal this _____ day of _____, 2018.

8

9                    _____

10                   Howard Reisman, CSR

11                   Illinois License No. 084-000411

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1   STATE OF ILLINOIS    )
2                        )  SS.
3   COUNTY OF COOK       )
4            IN THE UNITED STATES DISTRICT COURT
5            FOR THE NORTHERN DISTRICT OF ILLINOIS
6                     EASTERN DIVISION
7   ARMANDO ARIAS,            )
8           Plaintiff,        )
9       vs.                   ) No. 1:17-ev-08897
10  CITGO PETROLEUM CORPORATION, )
11  et al.,                   )
12          Defendant.        )
13          This is to certify that I have read the
14  transcript of my deposition taken in the above-entitled
15  cause and that the foregoing transcript, with the
16  corrections indicated, accurately states the questions
17  asked of me and the answers given by me.
18                          _____
19                          JAMES TANCREDI
20  SUBSCRIBED AND SWORN TO
21  before me this _____ day
22  of _____, 20__.
23      _____
24      Notary Public
```