# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AMANDO ARIAS,              )
                                   )
         Plaintiff,          )
                                   )      No. 17-cv-08897
     v.                       )
                                   )      Judge Andrea R. Wood
CITGO PETROLEUM CORPORATION,  )
et al.,                 )
                                   )
         Defendants.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Amando Arias worked as a Contractor Safety Coordinator for Defendant CITGO Petroleum Corporation ("Citgo") at its refinery in Lemont, Illinois ("Lemont Refinery") from 1997 until 2014. Arias claims that Citgo terminated his employment because he reported certain failures and violations of the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 *et seq.*, and for refusing to participate in Citgo's incident misclassification scheme. Arias has sued Citgo pursuant to the Illinois Whistleblower Act ("IWA"), 740 ILCS 174/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*[1] Arias also asserts a claim of common law retaliatory discharge. Now before the Court is Citgo's motion for summary judgment on all three of Arias's claims. (Dkt. No. 29.) For the following reasons, Citgo's motion is granted.[2]

---

[1] Arias originally named Citgo's parent companies—Citgo Holding, Inc., PDV America, Inc., and Petroleos de Venezuela S.A.—as Defendants. However, those entities were never served and, on September 4, 2019, Arias voluntarily dismissed the claims against them.

[2] Also before the Court are Citgo's motions to strike Arias's statement of material facts (Dkt. No. 45), parts of Arias's affidavit (Dkt. No. 41), and Roger Evans's affidavit (Dkt. No. 43). The Court will also address each of those motions in turn below.

# BACKGROUND

## I. Citgo's Motion to Strike Arias's Statement of Material Facts

Before summarizing the material facts, the Court addresses Arias's violations of Federal Rule of Civil Procedure 56 and Northern District of Illinois Local Rule 56.1, as raised by Citgo in its motion to strike Arias's statement of material facts. (Dkt. No. 45.) Federal Rule of Civil Procedure 56 and Local Rule 56.1 set forth the manner in which parties are required to present their factual assertions when supporting or opposing a motion for summary judgment. Under Rule 56(c):

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). In addition, the rule allows a party to object that material supporting or disputing a fact "cannot be presented in a form that would be admissible in evidence." *Id.* 56(c)(2). When a party fails to support an assertion of fact properly or address another party's factual assertion, the Court may afford the party the opportunity to support or address the fact, consider the fact undisputed for purposes of the motion, or grant summary judgment if the motion and facts, including those considered undisputed, show the movant is entitled to it. *Id.* 56(e).

Local Rule 56.1 requires the party moving for summary judgment to submit a statement of material facts it contends are undisputed and entitle it to summary judgment. L.R. 56.1(a)(3). The statement of facts "shall consist of short numbered paragraphs, including within each paragraph

specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." *Id.* 56.1(a). In addition, the rule requires the party opposing summary judgment to file a "concise response to the movant's statement." *Id.* 56.1(b)(3). The response should respond to each numbered paragraph in the moving party's statement and where the opposing party disputes a fact, it must include specific references to the affidavits, parts of the record, or other supporting materials relied on to controvert the fact. *Id.* Notably, Local Rule 56.1 does not allow the nonmoving party to set forth nonresponsive additional facts in its response to the statement of material facts. *De v. City of Chicago*, 912 F. Supp. 2d 709, 714–15 (N.D. Ill. 2012). To the extent the opposing party wishes to submit any additional facts, it must do so by submitting a separate statement of additional facts in a similar format to the moving party's statement of facts. L.R. 56.1(b)(3)(C); *De*, 912 F. Supp. 2d at 715 ("It is improper, and a violation of Local Rule 56.1, for the nonmoving party to add additional facts to his Local Rule 56.1(b)(3)(B) response; the nonmoving party's additional facts belong in a *separate* statement."). District courts are "entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Consequently, a district court is empowered to penalize noncompliance by striking improperly submitted additional facts or deeming admitted facts to which a party has not properly responded. *See De*, 912 F. Supp. 2d at 711–16.

Arias's counsel has violated both Rule 56 and Local Rule 56.1 in numerous ways. First, Arias's response to Citgo's statement of material facts disputes the vast majority of those facts. Yet many of the responses fail actually to controvert Citgo's factual allegations. Local Rule 56.1 "is not satisfied by evasive denials that do not fairly meet the substance of the material facts

asserted." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (interpreting the local rule later renumbered as L.R. 56.1). For example, Citgo states that,

> The Substance Abuse Policy provides that "the fact that alcohol may be served at a Company-approved function does not relieve employees of their responsibility to exercise moderation and judgment and to maintain control over their actions and behavior so as not to be a hazard or danger to themselves, other employees, the general public, or the Company's reputation."

(Pl.'s St. of Material Fact in Opp'n to Def.'s Mot. for Summ. J. ("PSMF") ¶ 11, Dkt. No. 37.) Arias responds, "Objection. IRRELEVANT. This is irrelevant because Plaintiff Arias did not serve or consume alcohol at a Company-approved function." (*Id.*) Arias's response did nothing to address the substance of Citgo's factual assertion regarding the dictates of the company's Substance Abuse Policy. In addition, Citgo states that Arias received and signed a "Final Warning Letter" reading, "You must understand that any further misconduct of any nature will result in your immediate termination of employment from CITGO. Your signature in the space provided below indicates your agreement with the conditions described in this letter." (*Id.* ¶ 20.) In response, Arias states, "Objection. Plaintiff did not sign the 'Final Warning Letter' because he agreed with its contents and Defendant's determination." (*Id.*) Again, Arias's response fails to admit, deny or even address the substance of Citgo's factual statements. Thus, in the many instances where Arias fails squarely to dispute an asserted fact, the fact will be treated as admitted so long as it is supported by the record.

In addition, Arias's counsel often introduces new facts in his responses to Citgo's statement of material facts. For example, Citgo states,

> On September 29, 2014, a CITGO employee complained to Human Resources ["HR"] Manager Dick Albaugh about [Arias's] "really despicable" behavior at the September 26 event. Albaugh and Dawn DeSandre then conducted an investigation and interviewed three employees who witnessed Plaintiff's conduct: Rob Grachan and Brian Rimbo (CITGO employees), and Jim Slinkard (CITGO contractor).

(*Id.* ¶ 22.) Rather than responding to Citgo's assertion, Arias describes the conduct of others: "Objection. Everybody was drinking and exhibiting non-work-like behavior at both the July 29, 2014 and September 26, 2014 events." (*Id.*) Arias then launches into a narrative about what he characterizes as Rimbo's "lewd and rowdy behavior," such as "pos[ing] for multiple scandalous photographs with waitresses from the Tilted Kilt." (*Id.*) Again, a response to a statement of material facts should not contain additional facts that do not meet the substance of the moving party's asserted facts. Any new facts must be introduced in a separate statement of additional facts. Therefore, Arias's nonresponsive additional facts are stricken and will not be considered by the Court.

## II. Factual Background

Except where otherwise indicated, the following facts are undisputed or deemed admitted due to Arias's counsel's Rule 56 and Local Rule 56.1 violations.

Citgo is a refiner, transporter, and marketer of transportation fuels, lubricants, petrochemicals, and other industrial products. (PSMF ¶ 2.) After Citgo acquired the Lemont Refinery in 1997, Arias became an employee of Citgo. (*Id.* ¶ 4.) In 2010, Arias assumed the position of Contractor Safety Coordinator at the Lemont Refinery. (*Id.* ¶ 5.) Arias's job responsibilities included "[s]erv[ing] as facility Subject Matter Expert (SME) for Contractor Safety and Construction Compliance per OSHA [The Occupational Safety and Health Administration] standards," "[i]dentif[ying] procedure/policy deviation and tak[ing] corrective action," and "[c]onduct[ing] compliance reviews and assessments of the facility contractors to include those performing work in routine maintenance, specialized tasks, and construction." (*Id.* ¶ 6.) At all relevant times, Arias's supervisor was Casey Bullock, the Health and Safety Manager at the Lemont Refinery. (*Id.* ¶ 5.)

## A.    Arias's Whistleblowing Claim

According to Arias, his employment relationship with Citgo ended as a consequence of his whistleblowing activity. Arias claims that in 2011, he became aware Citgo was operating a Fluid Catalytic Cracking ("FCC") unit with several reactor leaks and a weakened metal surface, which periodically suffered emergency shutdowns due to the leaks. (Pl's Additional Undisputed Material Facts ("PAUMF") ¶ 8, Dkt. No. 37.) According to Arias, Citgo responded to the leaks by "scabb[e]d" them: a nonsubstantive, temporary solution of placing a metal plate over the leak and welding it in place. (Def.'s Reply to Pl.'s Statement of Additional Facts ("DRPF") ¶ 9, Dkt. No. 48.) By contrast, Citgo claims the FCC unit did not experience any issues until May 10, 2012, after which Citgo reacted by shutting down the vessel to assess the situation and fix the leak. (PSMF ¶ 45.) Arias became concerned about the safety conditions at the Lemont Refinery, in part because he knew an accident had previously occurred there in 1984, which caused the deaths of seventeen employees. (DRPF ¶ 5.) At the time of the 1984 accident, Arias worked at the refinery and was on the premises. (*Id.*) Arias claims the accident was caused by an exploding FCC unit, whereas Bullock and Jim Tancredi (a Department Manager at Citgo) claim the explosion was a result of a bottom weld seam failure, which caused a ruptured vessel in a gas plant adjacent to an FCC unit. (*Id.*)

On February 14, 2013, Roger Evans, a chemical incident investigator at the United States Chemical Safety Board ("CSB"), sent an email to Arias requesting a series of documents relating to the July 1984 explosion at the Lemont Refinery and the contact information of "the appropriate person in the CITGO Lemont Refinery organization that can officially respond" to the request. (*Id.* ¶ 12.) Arias forwarded Evans's email to the appropriate superior personnel. (*Id.* ¶ 13.) In July 2013, Arias spoke to Evans about a fire that occurred at Citgo's refinery in Corpus Christi, Texas,

as well as another fire in Lake Charles, California. (*Id.* ¶ 14.) Arias and Evans also discussed the FCC unit's leaks, "what was going on [at the Lemont Refinery], and safety audits, incident investigation, case management and such, a lot of general safety conditions at the refinery." (*Id.*) Arias told Evans that Citgo was "reluctant to bring down and make the necessary repairs" to the leaking FCC and had merely scabbed the leaks. (*Id.*) Arias claims Evans offered, on behalf of the CSB, to pay for Arias to travel to Denver, Colorado, and meet with him in person about responses to the FCC unit's issues at the Lemont Refinery, but Bullock refused to allow him to go. (*Id.* ¶ 15.) Bullock, however, denies that Arias ever approached him regarding Evans's offer or his desire to discuss with Evans his concerns about the Lemont Refinery's safety conditions. (*Id.* ¶¶ 15–16.)

According to Arias, after he approached Bullock, Citgo began targeting him with adverse employment actions. Specifically, in October 2013, Citgo assigned Arias to the night shift. (*Id.* ¶ 18.) At the time, Arias was suffering from "a particularly painful" arthritis flare-up, and his doctor had prescribed him a series of work restrictions, including "light duty," indoor desk work, and reduced work hours; but Citgo assigned him to "particularly difficult and painful positions that exacerbated" his symptoms. (Arias Aff. ¶ 19, Dkt. No. 50.)Arias claims Citgo removed his work restrictions and assigned him to the night shift as punishment for telling Evans about his safety concerns. (DRPF ¶¶ 18–20.) Citgo explains that approximately half of its employees from all departments were assigned to the night shift in October 2013 to assist with rebuilding efforts after a fire caused extensive damage in the crude unit. (*Id.* ¶ 20.) Citgo also claims Arias's restrictions were accommodated, and he was assigned to sedentary office work for one to two weeks as requested by his doctor's note. (*Id.* ¶ 21.)

## B. Citgo's Explanation for Arias's Departure

Citgo offers an alternative narrative leading up to Arias's eventual departure, specifically pointing to his inappropriate behavior on two separate occasions. Citgo claims that Arias and other employees are required to follow various HR policies, such as the Harassment and Discrimination Policy and the Substance Abuse Policy. (PSMF ¶¶ 7, 8, 10.) An employee's failure to conform his behavior to these policies may "subject [him] to immediate discipline, up to and including termination of employment." (*Id.* ¶¶ 9, 12.) According to Citgo, Arias repeatedly violated these policies and, facing the possibility of termination due to his behavioral issues, he voluntarily resigned to preserve his benefits.

### 1. July 29, 2014 Boat Cruise

First, on July 29, 2014, Arias attended a boat-cruise outing with other Citgo employees at Navy Pier in Chicago. (*Id.* ¶ 15.) Arias claims the event was not a company-sanctioned event, whereas Citgo claims that it organized the event for Citgo employees. (*Id.*) After the event, a Citgo employee complained to the Human Resources department about Arias's behavior. (*Id.* ¶ 16.) Bullock, Jeff Rutter (Citgo's Labor Relations Manager), and Dawn DeSandre (Citgo's HR Business Consultant) interviewed Arias and eight other Citgo employees about what happened on the cruise. (*Id.* ¶ 16.) According to the interviewed employees, Arias became intoxicated and made "lewd insults" and "very disparaging, very harassing type comments." (*Id.* ¶ 15.) The interviewed employees also reported that Arias said, "Fuck you, J-Fo, fuck you!" to John Ford, a Citgo employee, in front of his wife and daughter; yelled, "Screw that one-eyed bitch," referring to Joan Bingham, Citgo's company nurse, referring to her blindness in one eye; referenced participating in a threesome with his wife and Bingham; asked why he did not get to "play with [Joan's] tits"; and demonstrated other crude and obnoxious behavior. (*Id.* ¶ 17.) Arias, for his part,

does not deny the accused conduct but claims to have no recollection of acting in that manner. (*Id.* ¶ 18.)

After the investigation, Citgo determined Arias had violated the Harassment and Discrimination and Substance Abuse policies. (*Id.* ¶ 19.) Citgo placed Arias on a 10-day suspension and issued him a Final Warning Letter stating, "You must understand that any further misconduct of any nature will result in your immediate termination of employment from CITGO. Your signature in the space provided below indicates your agreement with the conditions described in this letter." (*Id.* ¶ 20.) Arias signed the Final Warning Letter. (*Id.*)

### 2.    September 26, 2014 Golf, Lunch, and White Sox Game

On September 26, 2014, after his 10-day suspension had ended, Arias attended an outing involving golf, lunch, and a baseball game viewed from Citgo's box at the Chicago White Sox baseball stadium with other Citgo employees, representatives from Fire Aid (a Citgo vendor), the Romeoville Fire Chief, and the Lemont Fire Chief. (*Id.* ¶ 21.) Arias again disputes that this event was a company-sanctioned event.[3] (*Id.*) Regardless, on September 29, 2014, another Citgo employee complained to Albaugh about Arias's "really despicable" behavior at the September 26 event. (*Id.* ¶ 22.) Albaugh and DeSandre then conducted an investigation, interviewing three individuals who observed Arias's conduct that day: Citgo employees Rob Grachan and Brian Rimbo and Citgo contractor Jim Slinkard, who manages Citgo's box at the White Sox stadium. (*Id.*)

Grachan stated that Arias grabbed the Romeoville Fire Chief's crotch and said, "I bet Johnny does it like that," referring to John Ford; told Grachan to "go suck John's dick," again

---

[3] Specifically, Arias testified as his deposition, "I had been drinking. I'm also unclear as to whether or not it was even a 'company sanctioned' outing. I don't know the procedure for requesting a company outing, if you will. . . . It was my understanding that it was a bunch of firemen getting together." (Def.'s L.R. 56.1 Statement of Material Facts, Ex. A at 19–20, Dkt. No. 32-1.)

referring to Ford; and came up behind Grachan, grabbed his chest, and said, "nice tits." (*Id.* ¶ 23.) Grachan expressed feeling very upset by Arias's conduct. (*Id.*) Arias admits to engaging in the conduct described by Grachan. (*Id.*)

Grachan and Rimbo also recounted that Arias drank alcohol throughout the day and was noticeably drunk. (*Id.* ¶ 24.) Arias was too intoxicated to drive his own vehicle to the White Sox game, and the two Fire Chiefs in attendance told Grachan and Rimbo they needed to get Arias's conduct under control because he was acting like "an ass." (*Id.* ¶ 25.) Slinkard also said "it was clear" that Arias had been drinking before he arrived at the White Sox game, and he had to cut off Arias from further drinking. (*Id.* ¶¶ 24, 26.) Arias admits to consuming "two or three drinks" during the golf outing but denies drinking throughout the day or being noticeably drunk. (*Id.* ¶ 24.)

### C.  Arias's Resignation

On September 29, 2014, Arias was summoned to Citgo's Human Resources office to meet with Bullock, Albaugh, and DeSandre about his conduct on September 26. (*Id.* ¶ 28.) When Arias arrived at the office, he said he could "see where this is going," and he wanted to resign. (*Id.* ¶ 29.) Arias then drafted his resignation statement on a piece of paper in front of Bullock, Albaugh, and DeSandre. (*Id.* ¶ 29.) Arias later testified at his deposition,

> I felt pressured to leave because, as I stated, I see where this is going. I was going to be terminated. I was concerned about my benefits and my bonus and everything being gone. If I retire, I would get that. If I don't, then I'm terminated, and I lose it. I have no recourse to find another job. After 34 years of service, who is going to hire a man who was fired by his company?

(*Id.* ¶ 30.)

## D. Dispute Over Arias's 2014 Bonus

Citgo awards annual bonuses to its employees, which are individually calculated using a formula based on factors such as the company's overall performance, the individual's salary, and the individual employee's job performance. (*Id.* ¶ 34.) Bonuses are calculated by the employee's direct supervisor then reviewed and approved by the division managers, the Refinery leadership team, the Plan Manager, and the Vice President of Refining. (*Id.* at ¶ 37.) There is no written agreement regarding the bonus, but Citgo created a "Bonus Plan document" specifically laying out the maintenance and calculation of the bonus, including how the incentive pool is created and how individual performance modifiers are applied to calculate the total bonus payment. (*Id.* ¶ 43.) Arias claims all employees were "tacitly enrolled" in Citgo's company bonus plan and the company verbally acknowledges the existence of the bonus plan to all employees at the beginning of each year. (*Id.* ¶ 42.)

According to Citgo, job performance is evaluated based on an employee's fulfillment of his assigned duties and how he "conduct[s] [himself] professionally," such as complying with Human Resources policies and procedures. (*Id.* ¶ 36.) But according to Arias, the only relevant factor is whether he fulfilled the job duties of his position as a Contract Safety Coordinator. (*Id.*) An employee's job performance is rated on a scale from 1 to 5, with 1 being the best rating and 5 being the worst, and each rating corresponds with a range of percentage modifiers to be applied to the bonus. (*Id.* ¶ 35.) DeSandre and Tancredi testified that if an employee receives a rating of 4— as Arias did—his individual performance modifier ranges from 0% to 40%. (*Id.* ¶ 37.) By contrast, Christopher Newcomb, Citgo's General Manager of Health, Safety, Security, and Environmental Protection, testified that a rating of 4 corresponds directly with a 40% modifier. (*Id.* ¶ 39.)

On October 9, 2014, DeSandre sent an email to Arias informing him, "As a retiree you are eligible for a bonus, prorated based on the time you were actually an active employee." (*Id.* ¶ 30.) On March 25, 2015, however, DeSandre sent another email to Arias informing him he would not receive any bonus for his work in 2014. (*Id.* ¶ 33.) According to Citgo, Arias earned a performance rating of 4 in 2014, and Bullock exercised his discretion to apply a 0% modifier to Arias's bonus calculation due to his repeated policy violations. (*Id.* ¶ 39.) Bullock's decision was approved by Tancredi, the Refinery leadership team, Jim Cristman (Plan Manager), and Eduardo Assef (Vice President of Refining). DeSandre testified at her deposition that she was not aware of any other individuals with a rating of 4 or better who did not receive a bonus. (DRPF ¶ 32.)

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will be granted "when no reasonable jury could find in favor of the non-moving party." *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 657 (7th Cir. 2012). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256 (internal quotation marks omitted). Here, Arias has set forth three claims against Citgo: one under the IWA, one under the IWPCA, and one for common law retaliatory discharge.

### I.    Retaliatory Discharge (Count III)

The Court first addresses Count III of Arias's complaint, which alleges the common law tort of retaliatory discharge. In Illinois, a plaintiff asserting retaliatory discharge must show he

was "(1) discharged; (2) in retaliation for [his] activities; and (3) that the discharge violates a clear mandate of public policy." *Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909, 911 (Ill. 1988). Citgo argues that because Arias voluntarily resigned, he is prohibited from asserting a claim of retaliatory discharge. Indeed, the Illinois common law tort of retaliatory discharge requires that the plaintiff actually have been discharged by the employer. *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 730 (Ill. 1992); *see also Huffman v. MQ Constr. Co.*, No. 08 C 3679, 2008 WL 4613903, at *4 (N.D. Ill. Oct. 15, 2008) ("Voluntary resignation is not the same as being terminated for purposes of retaliatory discharge."). "There are no magic words required to discharge an employee . . . So long as the employer's message that the employee has been involuntarily terminated is clearly and unequivocally communicated to the employee, there has been an actual discharge, regardless of the form such discharge takes." *Hinthorn*, 519 N.E.2d at 912 (finding that while employer "never uttered the words 'you're fired,'" plaintiff had been discharged when company vice president informed her she "should seek other employment").

Arias contends that although he resigned, there is a question of fact for the jury to decide regarding whether his resignation was made "under duress" and thus in fact operated as a discharge. (Mem. in Opp'n to Def.'s Mot. for Summ. J. at 5, Dkt. No. 36.) For example, prior to his resignation, Arias had received and signed a Final Warning Letter issued by Citgo, which threatened future termination should he engage in any additional policy violations. However, Arias does not point to any clear or unequivocal message from Bullock, Albaugh, or DeSandre at the meeting on September 29, 2014, when Arias resigned. Instead, Arias states that he resigned *only* because "he could sense, ***given his experience as a longtime employee of CITGO*** . . . that he was being targeted for adverse employment actions and that [Citgo] intended to fire him as part of the ongoing retaliation he was experiencing since whistleblowing." (*Id.* (emphasis added)) Arias

also testified at his deposition that he made the calculated decision to resign so that he could not be discharged, thereby preserving his retirement benefits. As he explained, "I was concerned about my benefits and my bonus and everything being gone. If I retire, I would get that. If I don't, then I'm terminated, and I lose it." (PSMF ¶ 30.)

Moreover, Arias's description of "being targeted" and "ongoing retaliation" makes clear that he is in fact alleging constructive discharge, which the Seventh Circuit has defined as occurring when "employers made the work environment so inhospitable for the targeted employee that he or she was effectively forced to resign." *Ludwig v. C & A Wallcoverings, Inc.*, 960 F.2d 40, 43 (7th Cir. 1992). Unfortunately for Arias, Illinois common law does not recognize constructive retaliatory discharge as a cause of action. *See Newell v. Alden Vill. Health Facility for Children & Young Adults, Inc.*, No. 12 C 7185, 2013 WL 5663632, at *4 (N.D. Ill. Oct. 17, 2013) (citing *Grey v. First Nat'l Bank of Chi.*, 523 N.E.2d 1138, 1143 n.2 (Ill. App. Ct. 1988)). Therefore, no rational juror could find that Arias was actually discharged—as opposed to constructively discharged—and thus Citgo is entitled to summary judgment as to Count III.

## II.     Violation of the IWA (Count I)

As Arias was not actually discharged by Citgo, the Court next considers whether Arias suffered other adverse employment actions due to his whistleblowing activity in violation of the IWA. The IWA "prohibits an employer from 'retaliat[ing] against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation.'" *Thomas v. Guardsmark LLC*, 487 F.3d 531, 535 (7th Cir. 2007) (quoting 740 ILCS 174/15). Arias claims he engaged in whistleblowing activity by informing Evans, who worked for a government agency, of his concerns about safety conditions at the Lemont Refinery, reasonably

believing Citgo's failure to maintain or properly repair the FCC unit was a violation of OSHA Standard 1910.119.[4] *See* 29 C.F.R. § 1910.119. Arias also claims Citgo subsequently retaliated against him by removing his work restrictions and assigning him to a night shift.

Citgo first argues that Arias did not report any violations of law to Evans. Quibbling over Arias's word choice at his deposition, Citgo quotes Arias's statement that he spoke to Evans regarding "general conditions and my responsibilities and my thoughts at Lemont" as evidence that Arias did not mention any illegal conduct to Evans. But the Court finds Citgo's interpretation unpersuasive, as Arias elsewhere stated that he told Evans about the dangerous conditions relating to the FCC unit. Citgo also contends that Arias did not have a good-faith belief that Citgo was not meeting OSHA's standards because the FCC unit was "designed, maintained, inspected, tested, and operating [*sic*] in a safe manner." (Def.'s Memo. in Supp. of Mot. for Summ. J. at 9, Dkt. No. 30.) However, the Court finds that a rational jury could believe Arias's testimony that even though the FCC unit was routinely examined, Citgo failed to deal with any leaks appropriately and instead chose to scab over them. Put differently, even though the FCC unit was actually operating in line with OSHA standards, Arias could have reasonably believed that it was not, and his reasonable belief is the relevant factor for an IWA claim.

Nonetheless, the Court finds that Arias has not established a genuine dispute of fact regarding whether Citgo retaliated against him. While Arias claims that Citgo removed his work restrictions and assigned him to the night shift in retaliation for his whistleblowing activity, the only evidence to which he points is his own affidavit, which states that "[i]t was common knowledge amongst employees at the CITGO Lemont Refinery that being placed on night shift

---

[4] Arias also claims that the FCC unit issues violate American Society of Mechanical Engineers ("ASME") Code Section VIII, But the IWA only applies to violations of a state or federal law, rule, or regulation. 740 ILCS 174/15. The ASME Code does not qualify as such.

was a punishment." (Arias Aff. ¶ 19.) But while a "nonmoving party's own affidavit or depositions can constitute affirmative evidence to defeat a summary judgment motion, conclusory statements . . . do not create an issue of fact." *Mills v. First Fed. Sav. & Loan Ass'n of Belvedere*, 83 F.3d 833, 843 (7th Cir. 1996) (citations and internal quotation marks omitted). By contrast, Citgo has established through the testimony of several individuals that approximately half of its employees from all departments were assigned to the night shift in October 2013. (DRPF ¶ 18.) And when asked at his deposition whether "there was a particular event that led [Arias] and other Citgo employees to switch to the night shift at that time," Arias himself admitted, "it was high workload. It was after the crude [unit] fire." (Def.'s R. 56 St. of Mat. Facts, Ex. A at 212:13–20.) Moreover, Arias does not dispute that the night-shift assignment was temporary, and temporary assignments generally do not qualify as adverse employment actions. *See Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 649 (7th Cir. 2011) ("To qualify as adverse means materially adverse, not merely an inconvenience or a change in job responsibilities." (citation and internal quotation marks omitted)); *see also Anderson v. Foster Grp.*, 521 F.2d 758, 779 (N.D. Ill. 2007) (holding that temporary assignment did not qualify as materially adverse employment action as it did not alter the terms or conditions of plaintiff's employment).

Arias's affidavit recounts that Bingham told him "she was directed by her higher-ups to approve the removal of my work restrictions . . . and that it was her opinion that her being directed to do this was in retaliation for my reporting concerning dangerous conditions at the refinery." (Arias Aff. ¶ 17.) Bingham also apparently told Arias that Citgo was "planning to knowingly place me in particularly difficult and painful positions that exacerbated my arthritis symptoms to send a message to anybody who spoke out about the dangerous conditions of the FCC unit." (*Id.* ¶ 18.) But such unsworn, out-of-court statements are inadmissible hearsay, and

Arias has not established their admissibility under any exception to the hearsay rule.[5] Nor does Arias provide any additional evidence that the night-shift assignment was punishment; for example, he has not asserted that the night shift caused him to suffer pain or any other symptoms nor has he offered any testimony or documents from his doctor reflecting such.

Finally, although Arias does not make this argument in his opposition to Citgo's motion for summary judgment, in drawing all reasonable inferences in his favor, the Court considers whether the record contains any evidence that Citgo retaliated against Arias by issuing him an unwarranted Final Warning Letter. Arias claims that his conduct at the July 29 and September 26 events was no different or more egregious than that of other Citgo employees, implying that he was unfairly singled out by Citgo. But the mere issuance of a warning letter is not the kind of materially-adverse employment action that a plaintiff is required to show for an IWA claim. *See Parks v. Speedy Title & Appraisal Review Servs.*, 318 F. Supp. 3d 1053, 1062, 1070 (N.D. Ill. 2018) (holding that "under the IWA, an employer may not retaliate against an employee . . . through an act or omission materially adverse to a reasonable employee," and "a materially adverse employment action is one which visits upon a plaintiff a ***significant change*** in employment status" (emphasis added) (citations and internal quotation marks omitted)).

Therefore, the Court finds that Arias has not shown a genuine dispute of fact regarding Citgo's retaliation against him for whistleblowing activity. Summary judgment thus is warranted as to Count I.

---

[5] For example, they do not qualify as statement by an "agent or employee [of Citgo] on a matter within the scope of that relationship and while it existed," pursuant to Federal Rule of Evidence 801(d)(2)(D), as her statements were not made in the scope of her employment as a nurse. As Citgo points out, Bingham was not authorized to speak to the motivations of Arias's supervisors or Citgo's managerial team, and she in fact qualified her alleged statement that Citgo was retaliating against Arias as merely "her opinion." (Arias Aff. ¶ 17.)

### III.    Violation of the IWPCA (Count II)

In Count II, Arias claims that Citgo violated the IWPCA by withholding his bonus in 2014. "The IWPCA is designed to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation, without retaliation from employers." *Hess v. Bresney*, 784 F.3d 1154, 1161 (7th Cir. 2015) (citation and internal quotation marks omitted). The IWPCA defines final compensation to include not only salaries and other wages but also "earned bonuses." 820 ILCS 115/2. "An employee has a right to an earned bonus **when there is an unequivocal promise by the employer** and the employee has performed the requirements set forth in the bonus agreement between the parties **and all of the required conditions for receiving the bonus set forth in the bonus agreement have been met.**" *Hess*, 784 F.3d at 1162 (citation and internal quotation marks omitted).

To start, Arias has created a factual dispute regarding whether he has met the required conditions for receiving a bonus. According to Arias, the job performance portion of the bonus is based exclusively on his role as a Contractor Safety Coordinator. Arias argues that because Bullock admitted that, "[i]n general, [Arias's] performance in performing [his job] duties was good," Citgo owes him a bonus. (Def.'s L.R. 56.1 St. of Mat. Facts, Ex. B at 128:13–219:5, Dkt. No. 32-2.) On the other hand, Citgo claims an employee's professionalism is considered as well, and Arias failed to earn his bonus on account of "his behavior and the numerous lewd and vulgar things that he did." (*Id.* at 108:23–111:2.) The Court acknowledges a reasonable jury could side with either party on this issue.

But Arias has not created a genuine dispute of fact as to Citgo's unequivocal promise to pay him a bonus in the first place. Arias admits the bonus he seeks is not guaranteed by any written contract or agreement. *See, e.g.*, *Stark v. PPM Am., Inc.*, 354 F.3d 666, 672 (7th Cir. 2004)

("[T]he IWPCA requires a right to compensation pursuant to an employment contract or agreement . . . [Plaintiff] has no employment contract setting out the terms of his bonus."). While Citgo created a Bonus Plan document describing how bonuses are calculated, the document is not provided to employees, and Arias admitted he has never seen it. (PSMF ¶ 43.) Thus, the parties never manifested their "mutual assent" to the terms set forth in the document. *See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) ("[T]he IWPCA 'requires only a manifestation of mutual assent on the part of two or more persons . . . .'" (quoting *Zabinsky v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004))). And notably, Citgo's email to Arias expressly stated not that he would receive a bonus but merely that he was bonus-eligible. *See, e.g.*, *Hess*, 784 F.3d at 1162 (affirming grant of summary judgment where parties' agreement stated employee "will be *eligible* to receive a bonus" because "[e]ligibility, of course, is no guarantee").

Moreover, Citgo does not pay bonuses to employees who receive a rating of 5, and Arias admits that if he had received a rating of 5 in 2014, he would not have expected a bonus. What Arias appears to take issue with is the fact that although he received a rating of 4, but Bullock applied a 0% modifier rather than a 40% modifier. But Arias's alleged entitlement is rooted not in any type of agreement with Citgo but in Newcomb's testimony about Citgo's general practices when calculating bonuses, and an employer's past practices do not constitute an unequivocal promise to an employee. *Stark*, 354 F.3d at 672 (affirming summary judgment in favor of defendant on IWPCA claim after rejecting plaintiff's argument that "past practice constitutes a contract"). Finally, Arias has not offered any evidence showing that Citgo did not have the discretion to reduce or eliminate his bonus. Therefore, the Court grants summary judgment to Citgo on Arias's IWPCA claim in Count II.

## IV. Citgo's Motions to Strike the Affidavits of Arias and Roger Evans

Having ruled on Citgo's motion for summary judgment on the merits, the Court briefly addresses Citgo's motions to strike certain statements from Arias's and Evans's affidavits, which Arias submitted as exhibits to his opposition to Citgo's motion for summary judgment.

### A. Affidavit of Arias

Citgo first asks the Court to strike paragraph 3 of Arias's affidavit, in which he states, "I do not recall [lewd comments, jokes, and remarks of other employees] ever resulting in disciplinary actions and adverse employment actions." (Arias Aff. ¶ 3.) A witness must have personal knowledge of a matter to testify. *See Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991). Citgo argues this statement is not based on personal knowledge—as Arias was not in management or the Human Resources department—but the Court finds that Arias appropriately tailored his statement to his personal knowledge. But rather than asserting that **no** other employees ever suffered any disciplinary actions or adverse employment actions, Arias merely states he has **no recollection** of such an event. The Court thus declines to strike paragraph 3 and instead construes Arias's statement as merely asserting his lack of knowledge on this subject.

Citgo also objects to paragraph 15, in which Arias claims Bullock assigned him to the night shift to punish him for raising safety concerns about the Lemont Refinery's FCC unit. The Court agrees that Arias has not established his personal knowledge about Bullock's motivations and strikes the paragraph accordingly. *See Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) ("[C]onjecture or speculation regarding the employer's motives cannot be used to defeat a summary judgment motion.").

The Court also strikes paragraph 31, in which Arias claims, "[t]he only other CITGO employee that, to my knowledge, was also a whistleblower was terminated from his employment

with CITGO, likely in retaliation for his whistleblowing." The Court agrees with CITGO that Arias's claim that both he and this unidentified other former employee are both whistleblowers is an improper legal conclusion. *See, e.g.*, *Dominick v. Town of Cicero*, No. 09 C 4643, 2009 WL 4506319, at *1 (N.D. Ill. Nov. 30, 2009) (analyzing whether plaintiff alleged sufficient facts to show he met the legal definition of a whistleblower under the Illinois Whistleblower Act). Citgo also asks the Court to strike paragraphs 20, 22, 23, and 25 on account of Arias's lack of personal knowledge, but the Court did not rely on those statements in reaching its decision and thus denies the motion to strike those paragraphs as moot.

Citgo further asks the Court to strike paragraphs 17, 18, 19, 21, and 26 for containing inadmissible hearsay. As discussed above, the Court grants Citgo's motion as to Arias's assertions regarding Bingham's statements in paragraphs 17 and 18. In addition, the Court strikes paragraph 19, in which Arias asserts it was "common knowledge among employees . . . that being placed on night shift was a punishment," because such "common knowledge" statements have consistently been rejected as pure hearsay. *See, e.g.*, *Amari Co. v. Burgess*, 546 F. Supp. 2d 571, 577–78 (N.D. Ill. 2008) (excluding statement in plaintiff's affidavit that "it was common knowledge" that defendants "would take revenge on people who made them angry" as "pure hearsay"); *Rait v. Oshkosh Architectural Door Co.*, No. 05 C 1271, 2007 WL 702806, at *1 (E.D. Wis. Mar. 2, 2007) (finding that "'common knowledge' or, to be more precise, workplace rumor, constitutes inadmissible hearsay").

Citgo further asks the Court to strike paragraphs 25, 28, and 29 for violating the "best evidence" rule. In paragraphs 28 and 29, Arias references two emails he received from DeSandre after his resignation. However, the Court need not strike the paragraphs because even if it accepted Arias's paraphrasing of the two emails as true, Citgo is still entitled to summary

judgment. Paragraph 25 describes a photograph of Rimbo and other Citgo employees, but even if the evidence was submitted in its original form, it would be wholly irrelevant to Arias's claims. Finally, the Court declines to strike paragraphs 26 and 27, which Citgo claims contradict Arias's deposition testimony, but nonetheless finds they do not suffice to create a genuine dispute of fact regarding whether Arias was forced to resign.

### B.    Affidavit of Evans

Citgo also has filed a motion to strike certain portions of Evans's affidavit, specifically paragraphs 9–11, 13, 14, 18–21, 29, and 30–31. (Evans Aff., Dkt. No. 37-7.)

Paragraphs 9–11 discuss a fire at Citgo's refinery in Corpus Christi, and paragraph 14 discusses the function of FCC units. While Citgo objects that Evans's statements should be excluded as hearsay, the Court considers these statements not for the truth of the matter asserted but as evidence of Evans's reasonable belief that Citgo failed to comply with applicable state and federal laws, an essential element of an IWA claim. Citgo similarly argues that paragraphs 13 and 29 are inadmissible hearsay. In paragraph 13, Evans states that Arias told him about a scabbed FCC unit that Citgo was reluctant to repair. Similarly, in paragraph 29, Evans states that Arias expressed feeling concerned that a similar incident was at serious risk of occurring again, but Citgo was ignoring the danger. The Court finds these statements were not offered for the truth of the matter asserted by Arias but rather to show that Arias indeed reported what he believed to be misconduct by Citgo to a government agency—as Evans worked for CSB at the time. The Court thus denies Citgo's motion to strike these paragraphs.

Paragraphs 20–21 offer Evans's opinions that Arias was "uniquely equipped" to assist an investigation of the Lemont Refinery and Citgo "attempt[ed] to suppress and [*sic*] Mr. Arias' [*sic*] from voicing his safety concerns regarding the Lemont Refinery." Similarly, paragraphs 30–31

offer Evans's opinion that Arias is a whistleblower and was punished by Citgo for his whistleblowing activities. Because Evans, like Arias, seeks to offer impermissible legal opinions in these paragraphs, the Court strikes his statements.

Finally, Citgo seeks to strike paragraphs 18 and 19 for violating the "best evidence" rule, as Evans describes two documents that were not produced alongside his affidavit: a letter sent to Citgo employee Raymond Boutte regarding a request for incident information from the CSB and an email from Citgo referring to Arias as a "terminated employee." However, even if Evans had attached the two documents as described, the Court's decision as to the merits of Citgo's motion for summary judgment would remain unchanged. Citgo's motion to strike is thus denied as moot.

## CONCLUSION

For the foregoing reasons, Citgo's motion for summary judgment (Dkt. No. 29) is granted. In addition, its motion to strike the affidavit of Amando Arias (Dkt. No. 41) is granted in part and denied in part; its motion to strike the affidavit of Roger Evans (Dkt. No. 43) is denied as moot; and its motion to strike Plaintiff's local Rule 56.1(b)(3) response statement (Dkt. No. 45) is granted in part and denied in part.


ENTERED:

Dated: September 27, 2019

Andrea R. Wood
United States District Judge

23